# The Fame Insurance Company's Appeal.

1. The Enterprise Insurance Company and the Fame Insurance Company
entered into a contract by which the latter company agreed to re-insure the
former on all its term risks in Ohio, Indiana, Illinois, Missouri, Kentucky and
Pennsylvania, except Philadelphia, and exonerate it from all losses in one
class of cases, exceeding $5000, and in others denominated "extra hazardous"
exceeding $2500, and in the cases of dwelling-houses or their contents, to con-
tribute for the payment of losses, if any, in various proportions and amounts.
The losses, if any, were to be payable pro rata at such times and in such
manner as the former company may pay.   Losses covered by this agreement
occurred by the fire in Chicago on October 8th and 9th 1871.   *Held,* that a
court of equity would take jurisdiction of a bill by the assignee of the Enter-
prise Insurance Company against the Fame Insurance Company to enforce
this contract.

2. That the re-insured can resort to equity as soon as the claim arises without waiting to pay the original insured, and the words "may pay" held to be "liable to pay."

3. That as the act incorporating the Fame Insurance Company made it subject to the General Insurance Act of April 2d 1856, authorizing companies to "re-insure themselves," the contract was not *ultra vires*.

4. The sending to the Fame Insurance Company of insurances which they ought not to have had, and the withholding others which they should have had under the contract, did not work a forfeiture.

January 3d and 4th 1877. Before AGNEW, C. J., SHARSWOOD, MERCUR, GORDON and WOODWARD, JJ. WILLIAMS and PAXSON, JJ., absent.

Appeal from Nisi Prius. In Equity. January Term 1873, No. 13.

The bill in this case was filed November 30th 1872, by the Philadelphia Trust, Safe Deposit and Insurance Company, assignees of the Enterprise Insurance Company of Philadelphia, against the Fame Insurance Company.

The bill alleges that the Enterprise Insurance Company entered into an agreement with the Fame Insurance Company, on January 17th 1871, and by it the latter company agreed to *re-insure* the former company on all term risks assumed by it in the states of Ohio, Indiana, Illinois, Missouri, Kentucky and Pennsylvania, outside of Philadelphia, and exonerate the Enterprise Company from all losses exceeding $5000, in one class of cases; in other cases, from all losses exceeding $2500; and contribute in certain cases to the payment of losses in various proportions and amounts. After the date of the agreement, risks were assumed by the Enterprise Insurance Company, and reported to the Fame Insurance Company, which received the premiums therefor; that a fire occurred in Chicago, in October 1871, and property amounting to between $40,000 and $50,000, so insured, was destroyed; that the Enterprise Insurance Company, on October 31st 1871, made a deed of assignment to the Philadelphia Trust, Safe Deposit and Insurance Company, for the benefit of creditors; that the plaintiffs were desirous of producing the books of the Enterprise Insurance Company, and requested defendants to produce their books, that the account of the sums due under their agreement might be taken; that plaintiffs' demand for contribution and exoneration was properly cognisable by a court of equity, and prayed that the defendants should exonerate and discharge the plaintiffs as assignees in one class of cases, and in the other properly and rateably contribute towards the payment of the said losses by risks re-insured, and for an account.

Defendants demurred to the bill, on the grounds, 1. No cause for relief shown. 2. No discovery was alleged to be necessary. 3. No mutual accounts; and 4. No payment of losses alleged, and no right to demand from defendants any money.

The demurrer was overruled by SHARSWOOD, J. :—

"I think there is authority which sustains the jurisdiction of a court of equity in a case of this kind. A contract of re-insurance is a contract of indemnity. The re-insured may go into equity as soon as the claim arises upon him, without waiting to pay the original insured. I do not understand this to be denied by the learned counsel for the defendant. But he maintains that it is not applicable to this case, because, by the express terms of the contract, 'the losses, if any, are to be payable pro rata to the Enterprise Insurance Company, at such time and in such manner as the latter company may pay.' This clause must have such an interpretation as will not entirely defeat the contract. It can evidently have no application where, as in this case, the Enterprise Company have made a general assignment for the benefit of their creditors. If the assignee can only recover from the defendants when and as he pays dividends on the assigned estate to the original insured, it is plain an endless number of suits must be the consequence; and if it had so happened that there was no assigned estate, there could be no recovery at all. I would construe the words, 'as the latter company may pay,' to mean, 'as the latter company may be liable to pay.' It meant that the Fame company should have all the advantages of the Enterprise company as to the times and manner of payment; that they should not be called on to pay on the immediate happening of the loss, but whatever conditions as to the time and manner of payment might be annexed to the original policy should be extended to them."

Demurrer overruled.

The defendants then filed their answer.

The answer of defendants avers that the contract was beyond the lawful authority of defendants to make it, denied that defendants had agreed to exonerate the Enterprise Insurance Company from all losses over $5000, and in other cases all losses exceeding $2500; that the Enterprise Insurance Company failed to comply with the agreement in reporting and paying the premiums on all risks taken by them which were covered by the agreement; admits the losses by the Chicago fire covered by the agreement; denies that any sum was due plaintiff, and avers that the demand of plaintiff is not cognisable by a court of equity.

A replication was filed, and the cause was referred to George M. Dallas, Esq., as examiner and master.

The testimony is very voluminous; the master reported the following facts:—

"On the 17th of January 1871, the Enterprise Insurance Company and the Fame Insurance Company entered into an agreement as follows :—

"'The Enterprise Insurance Company and the Fame Insurance Company, both of Philadelphia, have made the following agreement,

viz.: The Fame Insurance Company hereby re-insures the Enterprise Insurance Company on the terms, in the manner, and to the extent hereinafter set forth, against loss or damage which shall or may happen by fire, on all term risks assumed after the date of this agreement by the Enterprise Insurance Company in the states of Ohio, Indiana, Missouri, Illinois, Kentucky and Pennsylvania (except the city of Philadelphia), on all risks over five thousand dollars (except on property denominated "extra hazardous" or " specially hazardous," and on dwellings and their contents), which the Enterprise Insurance Company may so assume, the Fame Insurance Company hereby re-insures the sum which shall exceed five thousand dollars.    Thus, for example, if a risk so assumed by the Enterprise Insurance Company be six thousand dollars, the Fame Insurance Company hereby re-insures one thousand dollars, and if the risk be nine thousand dollars, the Fame Insurance Company hereby re-insures four thousand dollars, and so of other sums on such risks over five thousand dollars.    On all risks denominated in the policies of the Enterprise Insurance Company " extra hazardous" or " specially hazardous" over twenty-five hundred dollars and not exceeding five thousand dollars, which the latter company may assume, and which shall not have been divided or apportioned in the policies issued by that company therefor in the manner hereinafter referred to, the Fame Insurance Company hereby re-insures the sum which shall exceed twenty-five hundred dollars.    Thus, for example, if such a risk so denominated be three thousand dollars, and no division or apportionment be made in the policy issued by the Enterprise Insurance Company therefor, the Fame Insurance Company hereby re-insures five hundred dollars, and if such a risk be five thousand dollars, the Fame Insurance Company hereby re-insures twenty-five hundred dollars, and so of such other risks over twenty-five hundred dollars.    In no case, however, is the Fame Insurance Company to be liable under this agreement for a greater sum than twenty-five hundred dollars upon any single risk taken on property so denominated " extra hazardous" or " specially hazardous," except where the interests insured in any one policy are therein so divided or apportioned as in the judgment of the respective officers of said companies not to subject either of them to a greater loss than twenty-five hundred dollars by any one fire, in which case the Fame Insurance Company shall not be liable under this agreement for a greater sum than five thousand dollars on any one policy on such property.    But when the risk so assumed by the Enterprise Insurance Company shall exceed five thousand dollars, then each of the said companies shall be liable for an equal amount. Nor shall the Fame Insurance Company be liable under this agreement for a greater sum than five thousand dollars on any single risk taken on any and all other property except on dwelling-houses and their contents.    On all risks on dwelling-houses and their con-

tents over five thousand dollars and under ten thousand dollars which the Enterprise Insurance Company may assume, the Fame Insurance Company hereby re-insures the sum which shall exceed five thousand dollars; but when the risk so assumed by the Enterprise Insurance Company shall exceed ten thousand dollars, then each of the said companies shall be liable for an equal amount. Thus, for example, if such a risk on dwelling-houses and their contents, or on a single dwelling and its contents, be for fifteen thousand dollars, then each of the said companies shall be liable for seventy-five hundred dollars; but the Fame Insurance Company shall not in any case be liable under this agreement for a greater sum than seventy-five hundred dollars ($7500) on any single risk taken on dwelling-houses and their contents, or on a dwelling-house and its contents. The said re-insurances are to attach simultaneously with the insurances so assumed by the Enterprise Insurance Company, at the same rate of premium, and to be subject to the same risks, valuations, conditions and modes of settlement as are or may be adopted by the said Enterprise Insurance Company. The losses, if any, are to be payable pro rata to the Enterprise Insurance Company at such times and in such manner as the latter company may pay. Other re-insurances by the said Enterprise Insurance Company of the same risks are hereby permitted, but notice thereof is to be given to the said Fame Insurance Company, upon receiving which notice the said Fame Insurance Company may terminate its re-insurances upon such particular risk or risks, as the Enterprise Insurance Company may have effected other re-insurances upon by giving three days' written notice to the said Enterprise Insurance Company of its desire to do so. The reports of all risks hereby re-insured by the Fame Insurance Company shall be made to the said company within three secular days after the Enterprise Insurance Company shall have received from its agents notice thereof, and the premium thereon (after deducting thirty per cent. therefrom for expenses and commission) shall be paid by the Enterprise Insurance Company to the Fame Insurance Company on or before the fifteenth day of every month on all risks thus re-insured during the preceding month. The Fame Insurance Company shall have the right at any time to examine, at the office of the Enterprise Insurance Company, the agents' returns of such risks as are provided for in this contract. Either company shall have the right to terminate this agreement at any time by giving to the other thirty days' notice thereof in writing.'

" The two insurance companies commenced the transaction of business under the foregoing agreement almost immediately upon its execution.

" The reports of insurances made on behalf of the Enterprise company, in the localities affected by the contract, were made to that company by its agents, upon forms designated ' Daily reports.' A

[Fame Ins. Co.'s Appeal.]

number of these are printed with the evidence, but a single one will serve to illustrate the first step taken by either of the parties to this controversy in dealing with its subject, and for this purpose only the following is, without selection, inserted here.   The portion here printed in ordinary type composed the form before use, the portion here printed in *italics* was written by the agents at Chicago before forwarding, and the words here printed in script were added, in lead pencil, at the Enterprise company's office in Philadelphia :—

*" ' Re-Ins. $2500.*

New No. 60. .           DAILY REPORT.

Last No. (of same risk.)          ——                         $5000

COPY OF POLICY ISSUED AT AGENCY OF

THE ENTERPRISE INSURANCE COMPANY

OF PHILADELPHIA,

AND FORWARDED TO THE OFFICE IMMEDIATELY THEREAFTER.

Give full wording of Policy in reporting either Original or Renewals.

Insuring *Page & Sprague, of Chicago, for Five · Thousand* Dollars.   On *stock in trade, their own, &c., consisting chiefly of paints, oils, varnishes, brushes, window-glass, turpentine, alcohol, painters' and glaziers' stock, in 4-story brick building, Nos. 12 & 14 Dearborn Street.   Warranted by assured that no benzine, benzole, naptha, kerosene or carbon oil shall be kept on premises, permission to keep one can of benzole in vault under sidewalk in front of premises.*

Additional Insurance, how much ? (If other insurance, the Policies should be concurrent.)   *Other Ins., &c.*

If policy covers merchandise, of what does the principal part consist ?

(This is wanted for classification of business.   Agents will please be particular.)

$5000.   Term of 12 *Mos.* at 2–10 *off* cents per $100.   Prem. $90.   Date, 7th *March* 1871.   Expiration, 7th *March* 1872.

Has this company other insurance on the
   premises, or within 100 feet ?
If so, how much, and under what policy ?

*GOODWIN & PASCO,*
                              S.              Agents.

[Other side important.   Please be particular.]'

" Upon receipt of these reports, they would be marked for re-insurance ; and, in a book which was kept for that purpose, and which was printed in blank, especially for use under this agreement, an entry upon the margin would be made as a memorandum of the transaction, and a corresponding slip be torn from that margin, and sent, unaccompanied by any other verbal or written communication, to the Fame company's office.   Of these marginal entries and orders, there are also a number printed in connection with

2 NORRIS—26

the examiner's report, but again one of each will serve the purpose of illustration, and, with that view solely, a single stub and corresponding slip are here produced—ordinary type indicating the printed portion of the original, and *italics* the part which is in writing:—

" ' RE-INSURANCE.

" ' *Pd.*—3, 14, '71.
Amount, $1500.
Term of *One Year.*
Beginning *February* 2d 1871.
On *household furniture contained in brick building.*
Situate *and known as Nos. 74, 76, 78 Michigan Ave., Chicago.*
Policy, No. 10.
Agency, *Chicago.*
Date, *February* 8th 1871.
                              *Prem.* $11.48.
14
" ' RE-INSURANCE in THE FAME INSURANCE COMPANY of Philadelphia against loss or damage by fire, for THE ENTERPRISE INSURANCE COMPANY of Philadelphia, in the sum of *Fifteen Hundred* dollars, for the term of *One Year,* beginning *February* 2d 1871. On *household furniture contained in brick building,* situate *and known as Nos. 74, 76 and 78 Michigan Avenue, Chicago, Illinois,* the same being part of sum insured by THE ENTERPRISE INSURANCE COMPANY for *John S. Ramsey,* by their policy, No. 10, *Chicago* Agency.

" ' This re-insurance is subject to all the terms and conditions set forth in the agreement executed by the said insurance companies, bearing date the 17th day of January 1871, with the same effect as if the same were herein inserted.

" ' Amount Re-insured, $1500, at 85 cents per $100. Prem. $11.48.                    10 *per cent. off.*
                                        *ALEX. W. WISTER,*
                                                    Secretary.

OFFICE OF THE ENTERPRISE INSURANCE COMPANY,
    Philadelphia, *February* 8th 1871.'

"The stub and slip cut therefrom each bore the same number, as in the instance just given—the number ' 14.'

"The Fame company kept, at their office in Philadelphia, a book which they designated their ' General Order-book,' which also contained a general system of numbers, for purposes of reference. In that book, under the Fame company's number, and between printed matter already on the page in connection with each of their numbers, the Fame company pasted the slips or orders just referred to, when and as they received them from the Enterprise company; but this course was adopted by the officers of the Fame simply as a matter of convenience, and without the knowledge of the Enter-

prise company, except that the secretary of the Fame company inci-
dentally called the attention of the secretary of the Enterprise com-
pany to the course he had adopted in this particular. The following
is a sample of the Enterprise slips as they appeared when pasted in
the Fame 'General Order-book,' in connection with the number
and printed matter contained in the latter—the slip, as it was
received from the Enterprise company, being the portion printed
between the lines extending across the page :—

" 'No. 10,574.                    Philadelphia, February 10th 1871.
    " 'Fame Insurance Company make insurance against loss or
damage by fire on the under-mentioned for the term of
                        at noon, viz. :—

---

" ' RE-INSURANCE IN THE FAME INSURANCE COMPANY of Phil-
adelphia against loss or damage by fire, for THE ENTERPRISE
INSURANCE COMPANY of Philadelphia, in the sum of *Twenty-five
Hundred* Dollars, for the term of *One Year*, beginning *February
6th* 1871 ; on *stock of printing office, presses run by steam-engine,
in rear of basement, in brick building, stone front, known as the
'Updyke Building,'* situate *Nos.* 108 *and* 110 *Randolph Street,
Chicago, Ill.*, the same being part of sum insured by THE ENTER-
PRISE INSURANCE COMPANY for *J. M. W. Jones*, by their Policy,
No. 19, *Chicago* Agency.
    " ' This re-insurance is subject to all the terms and conditions
set forth in the agreement executed by the said insurance compa-
nies, bearing date the 17th day of January 1871, with the same
effect as if the same were herein inserted.
    " 'Amount re-insured, $2500, at 1.40 cents per $100.   Prem.
$31.50.                    10 *per cent. off.*
                                        *ALEX. W. WISTER,*
                                                Secretary.'

---

    " These papers were treated by both parties as complete, and no
more formal policy was ever delivered or expected.
    " The premiums were paid each month by the Enterprise company,
and receipts taken therefor from the Fame company.   During the
first three months these bills were made out by the Enterprise com-
pany, and sent to the Fame ; but after that, by arrangement between
the secretaries of the respective companies, they were made out by
the latter.
    " The reports of insurances received by the Enterprise company
from their agents were never sent to the Fame company, but were,
in every instance, retained at the Enterprise office.   They were,
however, at all times freely open to inspection and examination by
the representatives of the Fame company, and its secretary did, in

fact, inspect all, or nearly all, of those which related to the risks which were certified to that company for re-insurance.

"The Fame company received from the Enterprise company a number of the certificates or orders cut from the book of the latter company, and regularly filled up in the form and manner before explained. Among them were fourteen slips based upon risks which had been taken by the Enterprise company in what afterwards became the burnt district of Chicago, and the dates of which, respectively, extended from February 8th 1871, until October 5th 1871, and in which the aggregate amount named for re-insurance was $47,000.

" Upon the morning of October 8th 1871, a conflagration commenced in Chicago, which continued during that and the following day, and the several subjects of risk which were referred to in the fourteen orders or certificates last mentioned were thereby destroyed.

" On the next day after that fire, viz.: October 10th 1871, the secretary of the Enterprise company received a note in these words:—

" 'When the losses are satisfactorily adjusted in Chicago, we are prepared to bear our portion of the burden.

" 'Would it not be best that your most efficient adjuster should, as the fire ceases, be upon the ground for an early and speedy settlement ?'

" This communication was signed *as* 'secretary,' by that officer of the Fame company, who had been especially active in conducting, on its behalf, the business under the agreement; but it was written and sent by him of his own motion, without consultation with or direction from any of the other officers or directors of the corporation.

" The proofs of loss under the insurances made by the Enterprise company, which formed the subject of these fourteen orders, were produced by plaintiffs and offered in evidence. They are fifteen in number—an apparent discrepancy, which is explained by the fact that one of the orders to the Fame company (although not so expressed) included two risks taken by the Enterprise company for Potter Palmer.

" These proofs of loss were all originals, except in the case of John S. Ramsey, referred to in order No. 14, $1500 on household furniture, as to which the original failed to reach the plaintiffs, and there was substituted and produced a copy of proof, with affidavit of Mr. Ramsey, made before a commissioner for Pennsylvania, resident at Chicago, that the copy is a true and correct one of his original proof of loss, which had been duly sworn to, proved, certified and forwarded by mail within the time prescribed by his policy.

" Except in the case of Ramsey, just referred to, the adjustment of the losses was faithfully and properly made by one whose business it was to do so, who was thoroughly acquainted with the subject, and who acted on behalf of the Enterprise company, and not of the

insured.  A record was made by him of the work when completed, and without any unnecessary loss of time.

" There were a number of cases of omissions to send risks to the Fame company, to which, under the agreement, they were entitled, and of risks sent in excess of what, by the agreement, the Fame were required to take.  This did not arise, however, from any fraudulent design on the part of the Enterprise company, or its officers or agents, but from mistakes incident to the character and extent of their business, and while the amount involved is large, the number of instances is relatively small.

" The master finds that losses, very considerable in amount, have been duly proved against the Enterprise company in eleven cases (additional to the fourteen heretofore separately treated) which were within the terms of the agreement of January 1st 1871 ; and that dividends thereon have been paid by the plaintiffs under the authority of two reports of an auditor, which have been duly confirmed ; but no slip or order, such as hereinbefore described, was sent in any of these eleven cases to the Fame company, nor did they have any notice thereof whatever, or receive any payment or offer of payment of premiums thereon ; and no knowledge that the Enterprise had taken such risks ever reached any of the officers of the Fame company until the pendency of this case before the examiner."

Upon these facts the master concluded as follows :—

" The questions arising upon the first and fourth reasons assigned in support of the defendants' demurrer, viz. : the questions of jurisdiction in equity, and of the liability of the Fame company to pay in advance of payment by the Enterprise, were again raised by the answer, and insisted upon before the master, who, however, is of opinion that they are not open for his consideration, having been decided and passed upon in the opinion of the court (Phila. T. & Safe Deposit Co. v. Fame Ins. Co., Leg. Int., vol. 30, p. 60) on the demurrer.  In that opinion his Honor Judge SHARSWOOD sustained the jurisdiction, and held that the ' re-insured may go into equity so soon as the claim arises upon him, without waiting to pay the original insured ;' and that this case is within the rule, the words, ' as the latter company may pay,' as they occur in the agreement, being construed to read, ' as the latter company may be *liable* to pay.'

" On behalf of the defendants it was contended that the agreement of January 17th 1871 was one which it was beyond the power of the Fame Insurance Company to enter into.  The point thus presented is of the first importance, for if it be well taken, the contract is absolutely void ; the question being one ' of statute power and public policy, not of mere equity between the parties :' Fowler v. Scully, 22 P. F. Smith 456.  For the plaintiffs, it was insisted that, even were the agreement in excess of the Fame's powers, yet, having been acted upon to the extent to which it had been, it would not be void, under a rule asserted and invoked, that

executed dealings, though in excess of corporate power, must be supported when required by good faith. To maintain this proposition, the learned counsel referred to Parish *v.* Wheeler, 22 N. Y. 494; Bissell *v.* The Railroad Companies, Id. 258; De Groff *v.* The American, &c., Co., 21 Id. 126. But these cases do not support the doctrine for which they were cited.

" The act incorporating the Fame Insurance Company made no special provision for its organization and management, and did not, in itself, contain a specific grant or limitation of power, but provided that the company should be organized and managed according to the provisions of the General Insurance Act of April 2d 1856 (Purd. Dig. 792), and that it should be 'limited to the risks designated in the first class in the 7th section of said act' (Purd. Dig. 792, pl. 7). The designation of risks in the class and section referred to is ' risks against fire on all kinds of buildings, merchandise and other property,' * * * ' and to re-insure themselves.' Upon this language, the learned counsel for defendants contended :—

" 1. That ' to take risks against fire' is to be construed as meaning to take them only in the manner which was customary when the act was passed—by ordinary policies.

" 2. That the section presents a case for the application of the maxim *expressio unius est exclusio alterius :* the words ' re-insure themselves' being exclusive of power to re-insure *others.*

" In support of the first of these positions, the learned counsel argued that the agreement in question is probably without parallel, and certainly was not preceded by any similar one existing at the date of the passage of the General Insurance Act, or of the Fame company's act of incorporation ; and that, as (Commonwealth *v.* Erie & N. E. Railroad Co., 3 Casey 351) 'laws must be executed according to the sense and meaning which they imported at the time of their passage,' this agreement, being of a species which could not have been known to the legislature when the acts before referred to were passed, cannot be warranted by their provisions. But, in the opinion of the master, this argument is fallacious. The power conferred by the act is to take risks, not to issue policies, and nothing is said in this section as to the form in which risks shall be taken. If the legislature had intended to restrict the power they conferred, so that it should be exercised only in the mode then in use, they would have said so. That they did not so intend, it is reasonable to infer ; for otherwise, it would be necessary to examine the policies of any company organized under the General Insurance Act, whenever it might be desired to determine its power to issue them, to ascertain whether they were the same as those or some of those which had been in use in 1856. Did the legislature mean, in passing an insurance act for the general government of that business, to prohibit every change which time and experience might suggest in the manner of conducting it ?

"In Commonwealth *v.* Erie & N. E. Railroad Co., *supra*, cited by counsel for defendants, the question involved was a very different one. There power had been conferred upon a corporation to construct a railroad from a certain designated point to another which was described as 'the borough of Erie.' That borough was subsequently extended sixty yards; and the court held that the terminus in mind when the act was passed, and therefore the one which must be adopted, was that which then existed. But there the line of road and its termini were the subjects of legislation; here, not the form of policy (the mode of contract), but taking risks (the thing to be contracted about) was the matter of legislative contemplation. That the contract now involved was, though not in form a policy, still an agreement to take risks against fire on 'property,' will appear in considering the next branch of this subject.

"The contention under the second branch of the argument for defendant upon this question of *ultra vires*, was that it is apparent, from the use of the words 're-insure themselves,' in close connection with the language that precedes them, that the subject of re-insurance was in view, and that the power of insurance companies upon that subject was designedly limited to re-insuring themselves, as distinguished from becoming themselves re-insurers; and the case of Bowery Insurance Co. *v.* New York Insurance Co., 17 Wend. 359, s. c. 1 Fire Ins. Cases 658, having been cited as expressly deciding that the power to re-insure is 'already included in the power to make contracts of insurance,' it was replied, and with correctness in fact, that the statute of New York to which the opinion in that case referred, did not mention the subject of re-insurance at all. Again the master is unable to adopt the reasoning or conclusion of defendant's counsel. The definition of re-insurance, as given by Phillips (Phil. on Ins., par. 374)—and it is described in substantially the same language in the authorities generally—is that it is a contract whereby one party, called the re-insurer, in consideration of a premium paid to him, agrees to indemnify the other against the risk insured by the latter, by a policy in favor of a third party. Clearly, re-insurance is the assumption of a risk of destruction of property by fire, whereby the re-insurer may assume all or any part of the risk of the original underwriter. It is but a modification of the contract of insurance, in which the thing insured is the same as in the original policy; but the subject of indemnity is the risk assumed by the first insurer. It is very similar to the common case of simple insurance in favor of a mortgagee, who becomes insured against loss of the property mortgaged, which, in such case, is the subject of risk, whilst the subject of indemnity is the mortgage debt. In granting the power to take risks generally, and without limitation as to its mode of exercise, the 7th section conferred the privilege of taking them by re-insurance as well as by original contract; and this conclusion is not, in the master's opin-

ion, affected by the addition of the words 'and to re-insure themselves,' for they are cumulative, and are inserted in extension and not in limitation of the grant.    The power *to insure*, in *every* lawful mode had, by the previous language, been already given, and by these words the right to *be insured* was added.    By the charter of the State Mutual Insurance Company, Pamph. L. 1853, p. 83—and there are probably many others which are like it—that company was empowered 'to insure all kinds of property against loss or damage by fire,' * * * 'and to cause themselves to be insured against any loss, damage or risk in the course of their business.' The word re-insure was not used, but it cannot be doubted that power to do so was included in that to insure generally, and the privilege of being in turn insured is *added*.    The same purpose was in view when the 7th section of the Act of 1856 was drafted, and it expresses it precisely, although in fewer words.

" This agreement, and the business transacted under it, are said to be invalid and unlawful for still another reason, viz. : that they involved a surrender of the corporate privileges and franchises of the Fame company to the Enterprise company, and the delegation of the powers and duties of the officers of the former to those of the latter corporation.    That such surrender and delegation are unlawful, was claimed, both upon general principles of law relating to corporations, and under the fourth section of the general insurance act (Purd. Dig. 791, pl. 4), which latter provides that 'the affairs of said company shall be managed by twelve directors,' * * * 'and the directors' * * * 'shall appoint a president and vice-president of the company, and such other officers and agents as they may deem necessary for conducting the business of the corporation ; who shall perform the duties of the respective offices until they shall be re-elected, removed from office, or their successors shall be chosen,' &c.

" The franchises of the Fame, and the duty of its officers, were, it was argued, attempted to be transferred by the agreement, because, by it the number, the nature and character, the consideration for, and the amount of each risk assumed by the Fame were to be fixed by the Enterprise company, to whom also was transferred the power to settle with the insured the form and substance of every policy, and finally, to attach the liability of the Fame, without consulting its officers, simultaneously with the assumption of the insurances by the Enterprise company.    It will be found that all these objections are dependent upon the right of the Fame company to make and contract for re-insurances ; for the matters here objected appear to be necessarily incident to the taking of a risk in that form.    In Philadelphia Ins. Co. *v.* Washington Ins. Co., before cited, the language of the policy of re-insurance was, so far as this question is concerned, the same as in this agreement, viz. : 'subject to such risks, valuations, conditions and mode of settlement as are

or may be assumed or adopted by them;' yet neither the very able counsel who argued that case, nor the eminent judge who delivered the opinion of the court upon it, suggested any doubt of the power to make the contract.

" In the opinion of the master, the agreement between the companies in this case, and the performance of the acts provided for in it, constituted a complete insurance made by and under the management of the officers of the Fame company, who do not appear to have been negligent in conducting its affairs; but if they had been, that would not have invalidated their acts on behalf of their company. An insurance corporation has undoubted power to employ agents to examine and report the number and nature of risks to be taken by it, and to rely upon the discretion of those agents; and no reason is perceived why, with equal propriety, the same questions might not be determined by reliance upon another company whose interest is the same, or why a re-insuring company may not lawfully agree that its premiums and amounts of insurance shall be ascertainable by reference to those of the company to be re-insured, instead of stating those particulars specifically in each instance.

" The whole subject, however, is, as already said, included in the right to re-insure. The liability of the re-insurer *must* always have reference to that of the first underwriter, by whom, of course, all the particulars of the original insurance must be settled with him who is primarily insured.

" Have the Enterprise company, or its assignees, forfeited their right to relief under the agreement, by the non-compliance of that company therewith, as found and reported by the master?

" The learned counsel of defendants contended that this interrogatory should be answered affirmatively; and, in an argument involving a very thorough examination of the subject, relied upon the nature of the stipulation for all risks of the classes mentioned in the agreement, within the limitations there prescribed, and no more; which, he insisted, was a *warranty*, the breach of which should be followed by the same consequences as a breach of warranty in a policy of insurance.

" He referred to the text writers and reported cases as follows: Phillips on Insurance, ch. 9, sect. 10, pl. 866, 869; Frisbie *v.* Fayette Ins. Co., 3 Casey 327; Jefferson Ins. Co. *v.* Cotheal, 7 Wend. 72; s. c. 1 Fire Ins. Cases 361; Dennistoun *v.* Lillie, 3 Bligh 202; Phillips on Ins., pl. 754; New Castle Fire Ins. Co. *v.* Macmorran, 1 Fire Ins. Cases 96; Lycoming Ins. Co. *v.* Mitchell & Boyle, 12 Wright 367; s. c. 1 P. F. Smith 409; Cumberland Val. Ins. Co. *v.* Douglas, 8 Id. 421; 3 Kent's Com. 288; 2 Pars. Conts., pp. 429, 431; Jennings *v.* Chenango Ins. Co., 2 Denio 75. To some only of these authorities need special reference be here made; but they have all been examined. They establish that any statement or averment as to an existing fact, made by the assured,

and incorporated in the policy, is a warranty, and that by breach of warranty, the policy is avoided.

"Thus far they all seem to go, and to unite in enforcing the doctrine of warranties in policies of insurance with extreme and especial rigor; because, upon the strictness with which the insured are held to such warranties, very largely depends the protection of insurers against deceit and fraud.  But they do not go as far as is necessary to the defence in this case.  In the first place, the agreement, as before stated, is not in itself a policy, and is by no means within the mischief just mentioned; for it was made between two insurance companies, each, presumably, equally well acquainted with the business about which they were contracting, and neither of them making any representations to the other, as that word is generally applied; and, although it is true, according to the master's finding, that the Fame company were not informed of the acts of the Enterprise which are now complained of, yet the right, and therefore, perhaps, the *duty* to inform themselves were theirs, under the agreement; which provided, not that the Fame company might examine the agent's reports only as to the risks which were reported by the Enterprise to the Fame, but as to 'such risks *as are provided for in this contract*.'  It is hardly possible that the officers of the respective companies would have replied in the affirmative if, at the time of the execution of this agreement, they had been asked whether they understood and intended that in case the Enterprise company (with this power of complete examination in the Fame) should fail to give all, or happen to give more risks to the latter than provided by their contract, the right of the Enterprise to recover for losses upon other risks, which had been actually given and accepted, and the premiums thereon paid, in accordance with the agreement, would be absolutely *forfeited*, as in the case of false representation touching premises to be insured, and amounting to warranty in an ordinary policy.  And yet the cardinal point to be reached in the construction of every contract, is the intention of the parties at the time they made it.

"Moreover, the stipulation in question does not purport to have been based upon an averment of the Enterprise company, and did not relate to a then existing fact.  It was simply a covenant or undertaking to be performed in the future—a promise, not even a representation.  In many of the books warranty is applied to matters to arise, as well as to those existing; and even in our own state, and in a recent case (Cumberland Valley Mut. Proct. Co. *v.* Douglas, 8 P. F. Smith 421), Judge STRONG incidentally so used it; but in Lycoming Ins. Co. *v.* Mitchell & Boyle, 12 Wright 367, the present chief justice has expressly considered this very subject, and has said that 'a warranty in a policy is understood to be a contract relating to an existing fact, and not a covenant for future acts.'

"On the whole the master is of opinion that this is not a case

for the enforcement of the doctrine of warranty, as applied to poli-
cies.   Under the authority last cited, this stipulation could not be,
in strictness, a warranty; and, as already shown, the agreement is
not a policy.   But a contract which is not a policy may contain a
covenant, the non-performance of which will practically work a for-
feiture, although that covenant be not technically a warranty; for
'it seems to be well settled that when there is a stipulation amount-
ing to a *condition precedent*, the failure of one party to perform
such condition will excuse the other party from all further perform-
ance of stipulations depending upon such prior performance; but a
failure to perform an independent stipulation, not amounting to a
condition precedent, though it subject the party failing to damages,
does not excuse the party on the other side from the performance
of all stipulations on his part:' Shaw, C. J., in Milldam Foundry
Co. *v.* Hovey, *infra*.   In the master's opinion, the real question
upon this branch of the present case arises under the principle of
law just stated; and the solution of that question involves the in-
quiry whether the covenant, as to the class and limitation of the
risks to be taken by the Fame company, was one upon which the
obligations of that company under the agreement *depended*, or, in
other words, whether it was or was not a *condition precedent*.   On
behalf of defendants, it was contended that it went to the whole con-
sideration, for the Fame company might well have been willing to
make a contract for all, and no more, of certain described risks, but
still wholly unwilling to take either 'less or more than precisely
what they had in view, and stipulated for, as a safe or profitable
number, amount or proportion.   This argument is not without
weight; but if it should prevail, the injustice which would result to
plaintiffs would be greater than that which it is urged will be done
to the defendants by disregarding it; for, if the plaintiffs were not
permitted to recover upon the re-insurances which were actually
perfected in accordance with the agreement, then would they fail to
obtain the indemnity for which they had actually and in good faith
contracted and paid; whilst in requiring the defendants to indem-
nify the plaintiffs in those cases, the right of the former to full com-
pensation for any loss or injury to them arising from the plaintiff's
failure to perform their covenants, is in no wise impinged.   In
Foundry Co. *v.* Hovey, 21 Pick. 417, the whole subject of depend-
ent covenants and conditions precedent is discussed, and the author-
ities reviewed, and the conclusion there arrived at is, that to consti-
tute an undertaking a condition precedent, it must appear, either:

"1. That it is in terms such: or,

"2. That the act stipulated for must *necessarily* precede the act
claimed to be dependent upon it: for if it be merely convenient, or
even beneficial, that the one should precede the other, and the in-
convenience or loss can be compensated in damages, the perform-
ance of the one is not a condition to the obligation of the other: or,

[Fame Ins. Co.'s Appeal.]

"3. That the non-performance upon one side goes to the entire substance of the contract, and to the whole consideration.

"In that case, defendant had accepted, and, in part, worked upon, a large quantity of materials furnished by plaintiff, and it was held that he was not excused from completing the work on them, as agreed, by the subsequent failure of plaintiff, after demand, to furnish further material, although the plaintiff thereby broke his covenant and became liable in damages therefor.

"That the covenant now under consideration is not made *in express terms* a condition precedent, inspection of the agreement determines; and that no reasonable construction of it (were construction called for) would warrant such an *interpretation* of the terms employed, has already been shown. Neither can it be said that the act stipulated for must *necessarily* precede the act claimed to be dependent upon it; for the re-insurances which were actually made under and in accordance with the agreement, were all, in fact, completed before the partial non-compliance of the Enterprise Company with that stipulation was known.

"The strength of the defence upon this point, lies in the effort to bring the covenant in question within the third class of conditions precedent as classified in the case reported in 21 Pick. 417: but it cannot prevail. 'The performance upon one side' does *not* go 'to the entire substance of the contract, and to the whole consideration;' but on the contrary the substance of the contract is plainly divisible and the consideration is clearly severable in its application to the numerous independent risks contemplated by the agreement.

"In Weaver v. Sessions, 6 Taunt. 154, it is held that in case of a continuous agreement for repeated distinct acts, the failure to perform some of the acts does not discharge the obligation of the other party in relation to the acts performed; and it was there said, 'if we were to hold this plea sufficient, we must decide that a single breach by the lessor would release the covenant of the lessee.' * * 'A breach by the landlord does not generally discharge the covenant of the tenant, nor must it be construed so, *because upon these covenants each party has a complete remedy against the other.*' * * 'I think each of these parties has a complete remedy, and must resort to the remedy by *actions on their respective covenants*, and that the breach by the plaintiff of his covenant, is no discharge of the present action.' In Story on Contracts, sect. 670, it is laid down that, even where there be ground for rescission, it should be partial and not *in toto*, if the contract be apportionable. See also Shields v. Davis, 6 Taunt. 65; Ritchie v. Atkinson, 10 East 295; Stavers v. Curling, 3 Bing. N. C. 355; McCulloch v. Cox, 6 Barb. 386; Keenan v. Brown, 21 Verm. 88.

"It is the consideration to be paid, not the subject or thing to be performed, that, in general, determines the class to which a contract belongs: 2 Parsons on Contracts 29, 30, 31; Lucesco Oil

[Fame Ins. Co.'s Appeal.]

Co. *v.* Brewer, 16 P. F. Smith 351; 1 Comyn on Contracts, sects. 23, 24; Boone *v.* Eyre, 1 H. Black. 273.

" Obermyer *v.* Nichols, 6 Binn. 159, is an early and well-considered Pennsylvania case, in which it was held that a covenant which does not go to the whole consideration, and a breach of which may be compensated in damages, is an independent covenant; and, applying that principle to the subject-matter of that case, it was decided that a landlord who had covenanted to make improvements, might recover the rent reserved, without averment or proof that the improvements had been made. To the same effect is Ligget *v.* Smith, 3 Watts 331.

" The agreement of January 1871 was for distinct and separate acts; the breach of covenant may be compensated in damages, and does not go to the whole consideration, as that test has been illustrated and applied by the courts; the contract has been in part performed, and the defendants, by receipt of premiums, partially benefited; and, finally, the most rational construction of ·the whole instrument (as shown at an earlier stage of this inquiry) is, that it was not the intention of the parties to give to this stipulation the effect of a condition precedent. For these reasons, and because the doctrine of warranties in policies of insurance is without application, the defence founded upon the non-compliance of the Enterprise company with the agreement is not sustained. If injury had resulted to the Fame company, damages therefor should be ascertained and allowed in this proceeding, and defendants not be put to a separate action for their recovery; but inasmuch as the failure of the Enterprise company to send to the Fame all the risks that it was entitled to have received, has not been a source of loss, but of gain (as the result has proved) to the latter company, no damages can be awarded."

Exceptions were filed by defendants, which were dismissed and the report confirmed. A decree was made accordingly for plaintiffs, for the sum of $50,207.82, with interest. Defendants below appealed and assigned for error the dismissing of the exceptions, confirming master's report and entering the decree for plaintiffs below.

*C. S. Pancoast* and *George W. Biddle,* for appellants.—The plaintiff below was not entitled to relief in equity. The original insured cannot come into equity for payment, and the position of the re-insured is the same. In all cases the defendant below was to pay plaintiff below a certain amount of money, and there is no liability to the original insured: Hastie *v.* De Peyster, 3 Caines 190; N. Y. State Ins. Co. *v.* Protection Ins. Co., 1 Story C. C. R. 458. The obligation was to pay, not to contribute: Dering *v.* Earl of Winchelsea, 1 Cox 321; Stirling *v.* Forrester, 3 Bligh 590. There is no jurisdiction on the ground of account or discovery:

[Fame Ins. Co.'s Appeal.]

Story's Eq. Pl., sect. 313; Story's Eq. Jur., sect. 74; Phillips *v.* Phillips, 9 Hare 473; Moxon *v.* Bright, Law Rep. 4 Ch. Ap. 292; Porter *v.* Spencer, 2 Johns. Ch. R. 169; Peare *v.* Corporation of Nashville, 10 Yerger 179; Fells *v.* Hills, 2 H. L. Cas. 28; Dinwiddie *v.* Bailey, 6 Vesey 136, and O'Connor *v.* Spaight, 1 Sch. & Lef. 309. Defendant below was not liable under the agreement on the happening of the loss: Mutual Ins. Co. *v.* Hone, 2 Comstock 235; New York State Ins. Co. *v.* Protection Co., 1 Story's C. C. R. 418. The contract was to pay at "such times and in such manner as the latter company (Enterprise) may pay." To interpolate the words "liable to pay" is to make a new contract. The contract was not one of insurance or re-insurance: N. Y. Bowery Ins. Co. *v.* N. Y. Ins. Co., 17 Wend. 359; 3 Kent Com. 279; 2 Parsons on Contracts 460. If a doubt as to corporate powers, the power does not exist: Pearce *v.* Railroad Co., 21 How. 444; Wood *et al. v.* Bedford & Bridgeport Railroad Co., Leg. Int. 1871, p. 53; In re Leeds Banking Co., Howard's Case, 1 Law Rep. Ch. Ap. Cas. 560; Stewart & Foltz's Appeal, 6 P. F. Smith 413; Manderson *v.* Commercial Bank, 4 Casey 379; Gillis *v.* Bailey, 1 Foster 149; Bank Com's *v.* Bank of Buffalo, 6 Paige Ch. R. 497; Percy *v.* Millandon, 3 La. 568; Ex parte Henry Winsor, 3 Story 416; McCullough *v.* Moss, 5 Denio 567; Cammeyer *v.* United Luth. Churches, 2 Sand. Ch. R. 209 (188); Perrine *v.* Chesapeake & Delaware Canal Co., 9 How. 184; Wittenton Mills *v.* Upton, 10 Gray 582; Whichcote *v.* Lawrence, 3 Vesey 750. The contract is *ultra vires*, because it provides for the company being bound by contracts made by another company: Fowler *v.* Scully, 22 P. F. Smith 461; Pittsburgh & Steubenville Railroad Co. *v.* Allegheny Co., 29 Id. 215; Pittsburgh & Connellsville Railroad Co. *v.* Clark, 5 Casey 146; Hazlett *v.* Ins. Co., 1 Weekly Notes 24. The Enterprise company withheld reports, and by this breach it was avoided and the testimony of the president of the Fame relating to the alteration of the agreement by which the word "all" was introduced should not have been excluded: Manning *v.* Purcell, 7 De G., McN. & G. 55; May *v.* Chaffee, 4 Chicago Leg. News 9; McFerren *v.* Mont Alto Iron Co., 26 P. F. Smith 182; Frisbie *v.* Fayette Ins. Co., 3 Casey 327; 3 Kent Com. 373 *283; Dennistoun *v.* Lillie, 3 Bligh. 202; New Castle Fire Ins. Co. *v.* Macmorran, 3 Dow. P. Cas. 255; s. c. 1 Fire Ins. Cases 96; Lycoming Ins. Co. *v.* Mitchell, 12 Wright 367; Jennings *v.* Chenango Ins. Co., 2 Denio 75.

*R. L. Ashhurst* and *William A. Porter*, for appellee.—As to jurisdiction exoneration has always stood with subrogation and contribution: Adams Eq. 267; Viele *v.* Hoag, 24 Verm. 46; Wayland *v.* Tucker, 4 Grattan 268; Couch *v.* Terry, 12

[Fame Ins. Co.'s Appeal.]

Ala. 225; Hickman v. McCurdy, 7 J. J. Marshall 559. Equity will decree specific performance of a contract to indemnify: Story's Eq., § 850; Ranelaugh v. Hayes, 1 Vernon 189; Champion v. Brown, 6 Johns. Ch. 406; Newby v. Reed, 1 W. Blacks. 416; Antrobus v. Davidson, 3 Meriv. 578; McCormick v. Irwin, 11 Casey 111. Equity has full jurisdiction to enforce specific performance of an ordinary contract of insurance by reason of irregularity in the policy : Union Mut. Ins. Co. v. Commercial Mut. Ins. Co., 2 Curtis 524; Suydar v. Ins. Co., 18 Ohio 459; Perkins v. Washington Ins. Co., 4 Cowen 645. The bill is for an account and discovery, and equity has jurisdiction. The Fame company was bound to pay when the losses occurred and the Enterprise company became "liable to pay." The assignment of the Enterprise Ins. Co. for the benefit of creditors was equivalent to legal payment by that company in the sense contemplated by the agreement: Miller's Appeal, 11 Casey 481; Graeff's Appeal, 2 Weekly Notes 104. If the first insured compromise with the assured he can recover the whole amount from the re-insurer : Flanders on Insurance 42; Mut. Ins. Co. v. Hone, 2 Comstk. 235; Herckenrath v. Ins. Co., 3 Barb. Ch. 63; Carrington v. Ins. Co., 1 Bosw. 152; Eagle Ins. Co. v. Lafayette Ins. Co., 9 Ind. 445; Ins. Co. v. Cashow, 41 Md. 59; Blackstone v. Insurance Co., 56 N. Y. 107; Mackenzie v. Whitworth, Law Rep. 10 Exch. 36; Cummings v. Cheshire, Ins. Co., Legal Gazette 1876, p. 22. A bill will lie as soon as the liability to pay becomes absolute : Carman v. Noble, 9 Barr 371; Stroh v. Kimmel, 8 Watts 157; Bamford v. Keefer, 18 P. F. Smith 391. The contract was not ultra vires, but was within the power of the Fame company to make under the power to re-insure: Philad. Ins. Co. v. Washington Ins. Co., 11 Harris 253; Phila. Ins. Co. v. Ins. Co., 11 Harris 65; Bowery Ins. Co. v. N. Y. Ins. Co., 17 Wend. 359. Prima facie all contracts are valid; he who assails must show there is no authority for making them: Scottish N. E. Railway Co. v. Stewart, 3 Macq. 382–414; Eastern Railway Co. v. Hawkes, 5 H. L. Cases 331; Pearse v. Morrice, 2 Ad. & E. 94; Rex v. Loxdale, 1 Burr. 447; Forrest v. Manchester S. & L. Railway Co., 30 Beavan 40; Brown v. Winnisimmet Co., 11 Allen 326; Simpson v. Westminster Palace Hotel Co., Limited, 2 DeG., F. & J. 141, affirmed 8 H. L. Cases 712; First Nat. Bank v. Graham, 32 Leg. Int. 440; Lyndeborough Glass Co. v. Massachusetts Glass Co., 111 Mass. 315; Midland Railway Co. v. Great Western Railway Company, Law Rep. 8 Ch. App. 841; Hartford & New Haven Railroad Co. v. New York & New Haven Railroad Co., 3 Rob. 411; Stewart v. Erie & Western Transp. Co., 17 Minn. 372; Sussex Railroad Co. v. Morris & Essex Railroad Co., 4 C. E. Green 13; Columbus, P. & I. Railroad Co. v. Indianapolis & Bell. Railroad Co., 5 McLean 450; Hare v. London Co., 2 J. & H. 80; Delaware & Hudson Canal Co. v. Penna. Coal Co., 9 Harris 144, s. c. 7 Wright 295. A contract executed and benefits

[Fame Ins. Co.'s Appeal.]

received thereunder cannot be successfully assailed as ultra vires: Bradley *v.* Ballard, 55 Ill. 417 ; California Gas Co. *v.* San Francisco, 9 Cal. 453 ; Allen *v.* First National Bank, 23 Ohio St. 97 ; Ossipee *v.* Canney, 2 Am. L. T. Reps. N. S. 514. The agreement to give all the insurances of a certain character was not a warranty. The contract was for certain re-insurances and any omissions could be compensated in damages: Boone *v.* Eyre, 1 H. Blackstone 273, note ; Ritchie *v.* Atkinson, 10 East 306; Davidson *v.* Gwynne, 12 Id. 381 ; Weaver *v.* Sessions, 6 Taunt. 155 ; MacAndrew *v.* Chapple, Law Rep. 1 C. P. 643 ; Freeman *v.* Taylor, 8 Bing. 124 ; Lucesco Oil Co. *v.* Brewer, 16 P. F. Smith 351 ; Morgan *v.* McKee, 27 Id. 229 ; Foundry Co. *v.* Hovey, 21 Pick. 417.

The Judgment of the Supreme Court was entered January 15th 1877,

PER CURIAM.—It is unnecessary to enlarge upon the prominent questions argued in this case, as we are of opinion there is not a sufficient ground of reversal. That some of the questions are close and difficult, must be conceded. They have, however, been well investigated and ably treated by the learned master ; and we are not able to see our way clear to reverse his conclusions. Substantial equity has been done, and the interests of justice require the decree to stand.

> The decree at Nisi Prius is affirmed and the appeal is dismissed, with costs to be paid by the appellants.