## MANHATTAN LIFE INS. CO. v. PRUSSIAN LIFE INS. CO. et al.

(Circuit Court of Appeals, Second Circuit.    January 7, 1924.)

### No. 157.

1. **Contracts** ⬤⟿171(1)—**Where promises assented to as a whole, contract is indivisible.**

    Though a contract contain a plurality of promises, if the promises are assented to as a single whole, the contract is indivisible, and the breaking of any promise is a breach of the entire contract.

2. **Contracts** ⬤⟿147(1)—**Parties' intent guide in determining kind of contract.**

    The intent of the parties is the guide in determining the kind of contract made.

3. **Contracts** ⬤⟿317—**Material breach of divisible contract terminates obligation.**

    Whether promises of a bilateral engagement be dependent or independent, the important question is whether the breach is material, and, if it is material, then it goes to the whole contract, even in installment agreements; materiality being a question of fact.

Appeal from the District Court of the United States for the Southern District of New York.

Suit in equity by the Manhattan Life Insurance Company against the Prussian Life Insurance Company (Preussiche Lebens-Versicherungs-Actien-Gesellschaft) of Berlin, Germany, Thomas W. Miller, successor of Francis P. Garvan, as Alien Property Custodian, and Guy F. Allen, as Treasurer of the United States. From a decree for complainant as to only part of its claim, it alone appeals. Affirmed.

The plaintiff (hereinafter called "Manhattan") is a life insurance company created by the laws of New York. The principal defendant (hereinafter called "Prussian") is a corporation existing under the laws of the German Empire, and was at the times important in this litigation duly authorized to transact the business of reinsurance in the state of New York. Notwithstanding the outbreak of war between Germany and the United States, the Prussian continued to do business, under licenses duly issued by the Secretary of the Treasury, during all the times here involved. Therefore, although this is technically a proceeding under the Trading with the Enemy Act, it may be regarded, for all practical purposes, as an ordinary litigation between Manhattan and Prussian.

In 1914 what is called in the business a "treaty" for reinsurance—i. e., a contract—was made between Manhattan and Prussian. The object of such contract is set forth in the document itself, namely, that the Manhattan desired "to procure reinsurance of a portion of its liability" under certain of its outstanding life insurance policies. Therefore it was agreed, in consideration of certain premiums payable annually, that Manhattan "shall reinsure with the Prussian any excess of the amount (of certain kinds of policies) over its stated maximum limits of retention issued on any one life." By other portions of the contract the amount that the Prussian could reinsure upon any one life was limited.

The contract then goes on to declare that: "Nothing herein contained shall be construed as preventing the Manhattan from reinsuring with other companies any further excess arising above the said limit of retention and this [i. e., the Prussian's] first excess reinsurance." That is to say—on certain kinds of life insurance, if the Manhattan desired any reinsurance, it agreed to give the first excess to the Prussian to the limit fixed by the contract itself.

The foregoing quotations are from the beginning of the contract or treaty. The matter is then put as follows in article 7 of the contract, of which the important words are as follows: "All reinsurances shall, subject to the pay-

⬤⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

ment of reinsurance premium, be continued in force during the currency of the Manhattan's policy and shall cease when the liability of the Manhattan ceases or as hereinafter provided in article 9." (Article 9 refers merely to cancellations and rejections made by the Manhattan in respect of its own policies.)

After providing for rates of premium and other details of business, the reinsurance treaty concludes as follows: "This agreement shall take effect on the 15th day of January, 1914, is unlimited as to its duration, and may be terminated by either party upon one month's notice of cancellation in writing by registered letter. But reinsurance then in force shall be carried by the Prussian in accordance with the terms of this agreement unless terminated or modified by a special agreement."

One other section of the contract is important here, the fifteenth, which reads as follows: "The Prussian may at all reasonable times peruse, in the Manhattan's office, the original papers, books, records, files, etc., appertaining to any risks reinsured under this agreement."

After war became flagrant between this country and Germany, Manhattan sought other reinsurance, and on November 14, 1917, served a formal notice of cancellation of the treaty or contract of 1914 on Prussian. Manhattan had obtained other reinsurance, not only for new business, but for some of the policies already reinsured with Prussian. Therefore, after the expiration of a month from the date of its cancellation notice, Manhattan ceased to pay Prussian renewal premiums on the reinsurance of such of its risks as it had satisfactorily reinsured elsewhere; but it continued to pay or tender payment of premiums on such risks as it had not reinsured with other companies.

This neglect to pay some premiums while paying others naturally attracted the attention of Prussian, which thereupon formally demanded in writing an examination of Manhattan's books and records relating to the items as to which renewal premiums were not being paid as above noted. This demand for investigation or information Manhattan refused. Thereupon, and on July 22, 1918, Prussian gave Manhattan notice formally and in writing that it "does hereby terminate its liability under said agreement" of 1914, and it also assumed to terminate its liability on "all certificates of reinsurance heretofore issued pursuant thereto." This notice assigned as breaches of contract by Manhattan the nonpayment of premiums due and the refusal of permission to examine books as above stated.

The Manhattan continued to tender premiums after receipt of this notice, and Prussian continued its declinations thereof. Much immaterial correspondence occurred between the parties over this matter, and while these offers and refusals were going on a holder of Manhattan insurance policies to a considerable extent died. This risk had been reinsured with the Prussian, and was one of those that had not been reinsured elsewhere.

Thereupon Manhattan brought this suit for the purpose of recovering (1) such unearned premiums as Prussian had received and had in possession at the time of attempted cancellation; (2) the amount for which Prussian had reinsured the risk matured by death as aforesaid; and (3) the additional cost of reinsurance ultimately placed elsewhere by Manhattan in respect of those risks which it desired to continue with Prussian.

The court below gave judgment only for the amount of unearned premiums in Prussian's possession. Thereupon plaintiff alone appealed.

Kelly, Hewitt & Harte, of New York City (D. Theodore Kelly and Howard B. Harte, both of New York City, of counsel), for appellant.

Hartwell Cabell, of New York City, for appellee Prussian Life Ins. Co.

William Hayward, U. S. Atty., of New York City, and I. M. Meekins, of Elizabeth City, N. C., for appellee Alien Property Custodian.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

HOUGH, Circuit Judge (after stating the facts as above). [1] Reduced to its lowest terms plaintiff's proposition is this: My con-

tract with Prussian meant that, when I exercised my right of cancellation by giving a month's notice in writing, I could thereafter leave the Prussian as reinsurer on such then existing risks as I did not care to place elsewhere, but as to any risk on which I preferred other reinsurers, or no reinsurance, I could whenever I pleased cease paying premiums. Colloquially put, this interpretation empowered Manhattan to take at pleasure the cream of its business from Prussian, and leave the latter the skim milk.

Technically phrased, Manhattan asserts that, whatever may be said of the agreement to place "any excess" over its own retention limit with Prussian, the agreement section providing that reinsurance "in force (at cancellation) *shall* be carried by the Prussian in accordance with the terms of this agreement, unless terminated or modified by special agreement," embodies a divisible contract, the factors being the several risks; therefore if and when Manhattan committed a breach in respect of one or more risks by failing to pay premiums, Prussian was not thereby released from the obligation of carrying the remaining risks, but was left to such action for damages as it might be able to bring in respect of premiums not paid.

However put, we cannot accede to this interpretation; it distinctly lacks morals, and this suit is in equity; and while equity follows the law, we regard the contract between the parties as legally single. It was, as has been well said, a contract for insurance, not one of insurance, and the insurance which Prussian agreed to furnish was to be in respect of the entire first excess over Manhattan's retention limit, as specifically set forth in the agreement itself. Whatever was the body of insurance thus furnished and in being, at the moment of cancellation, that whole body of insurance Prussian was to continue to carry until Manhattan's primary liability was ended, saving special agreements from time to time made. The agreement between the parties referred, not to particular risks, but to the assumption of a corpus of liability; it dealt not in retail, but in gross.

Undoubtedly the corpus had many members—i. e., the several risks —but the written contract of 1914 did not go into these details; it treated only of the aggregate. An agreement such as this yields no answer favorable to plaintiff, when the question suggested as a test of divisibility in Williston, Cont. § 863, is put, viz.: Did the parties assent to all the promises as a single whole, so that there would have been no bargain whatever, if any promise or set of promises were struck out? It is too plain for argument that no reasonable man acting for Prussian would have signed the contract of 1914, if he had been authoritatively told that it meant that Manhattan could and would hand over all its first excess of reinsurance, then cancel, and then make better bargains elsewhere for all its desirable risks. The agreement was for *all* and *any*, and a withdrawal of *some* went to the root of the matter on which minds had met.

[2] Consequently we hold, on the wording of the contract, that Manhattan committed two breaches of the whole agreement: (1) It refused to permit an examination of its books, etc., as to some risks, and *some* risks are included in the phrase "any risks" used in the fifteenth section; and (2) it deliberately and not by inadvertence re-

fused to pay premiums on numerous risks, which were part of the "reinsurance in force" when cancellation notice given. This was the intent of the parties, which is the guide in determining the kind of contract made. Rosenthal v. National, 226 N. Y. 313, 320, 123 N. E. 766.

[3] But whether the covenants or promises of a bilateral engagement be considered as dependent or independent, the really important question is whether the breach is material; if it is, it goes to the root of the whole matter. In other words, what kind of a breach was committed? If it is material—i. e., destructive of the contract essence—then it goes to the whole contract, even in installment agreements. Whether the breach is material is a question of fact. Williston, Cont. §§ 864–867; Norrington v. Wright, 115 U. S. 188, 6 Sup. Ct. 12, 29 L. Ed. 366; Cleveland v. Rhodes, 121 U. S. 255, 7 Sup. Ct. 882, 30 L. Ed. 920; Anvil Co. v. Humble, 153 U. S. 540, 14 Sup. Ct. 876, 38 L. Ed. 814. The breaches here committed by Manhattan were material, and Prussian was well justified in acting as it did.

The facts in Fame Ins. Co.'s Appeal, 83 Pa. 396 (much insisted on by plaintiff because it is one of the very few cases on reinsurance found in the books), illustrate perfectly Prof. Williston's point about material breaches. The Fame Company was reinsurer for another concern that was hard hit by the Chicago fire of 1871, and it resisted payment of its asserted liabilities, because after the fire it discovered that its customer had, not by fraud, but by clerical inadvertence or ineptitude, neglected to give it notice of certain risks which it was entitled to reinsure. By this oversight its liability was greatly lessened. The opinion of the master (afterwards Dallas, Circuit Judge), affirmed by the Supreme Court, holds that, since the failure to report and pay premiums was not in express terms made a condition precedent to recovery on any reinsurance, each risk should be regarded as an independent agreement. We cannot so read the contract before us.

As defendant has not appealed, we are not called upon to consider the propriety of the award of unearned premiums.

Decree affirmed, with costs.