## CLEVELAND ROLLING MILL *v.* RHODES.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE
NORTHERN DISTRICT OF ILLINOIS.

Argued March 29, 1887. — Decided April 11, 1887.

A merchant agreed in writing with the owner of a rolling mill to sell him
"the entire product of 14,000 tons iron ore, to be manufactured into pig
iron with charcoal" at the furnace of a third person, "and shipped in
vessel cargoes, as rapidly as possible, during the season of navigation
of 1880," to the buyer's mill, and "such portion of the product of said
ore, as is made after the close of navigation of 1880, is to be shipped on
the opening of navigation of 1881, or as near the opening as possible,"
but the buyer to have the privilege of ordering this portion to be for-
warded by railroad during the winter of 1880–81. The whole amount of
pig iron made from the 14,000 tons of ore was 8000 tons, of which 3421
tons were shipped before the close of navigation in 1880, and accepted
and paid for. For want of a sufficient supply of charcoal to keep the
furnace at work, only 3506 tons more were made and ready for shipment
by the opening of navigation in 1881, and were then shipped as soon as
possible; and the remaining 1073 tons were made afterwards, and shipped
from time to time during the ensuing two months. *Held*, that the buyer
might refuse to accept the iron shipped in 1881.

THIS was an action brought by Rhodes and Bradley, co-
partners, and citizens of Chicago in the State of Illinois,
against the Cleveland Rolling Mill Company, a corporation
of the State of Ohio, upon the following agreement in writ-
ing, signed by both parties:

"This agreement, made this sixteenth day of February,
1880, by and between Rhodes & Bradley, of Chicago, Ill.,
and the Cleveland Rolling Mill Co., of Cleveland, Ohio, wit-
nesseth: That said Rhodes & Bradley have sold to the said
Cleveland Rolling Mill Co. the entire product of fourteen
thousand (14,000) tons iron ore, to be manufactured into pig
iron with charcoal by the Leland Furnace Co., of Leland,
Mich., said furnace to make as nearly all numbers one and two
iron as possible, and to be shipped in vessel cargoes as rapidly
as possible to the Cleveland Rolling Mill Co., at Cleveland,
Ohio, during the season of navigation of 1880. Such portion

of the product of said ores, as is made after the close of navi-·
gation of 1880, is to be shipped by vessel to Cleveland on the
opening of navigation of 1881, or as near the opening as pos-
sible; said Cleveland Rolling Mill Co. to have the privilege of
ordering the iron, which may be made too late for shipment by
lake during the season of 1880, through by rail to Cleveland
during the winter of 1880 and 1881, they to pay the additional
expense of hauling to railroad and freighting through to Cleve-
land by rail, over and above what it would cost Rhodes &
Bradley to ship by lake on the opening of navigation 1881.

"Said Cleveland Rolling Mill Co. agree to receive said iron
as rapidly as shipped, and to pay forty-five dollars ($45) per
ton (2,240 lbs.) cash for same delivered on rail or vessel at
Cleveland, Ohio.   The Cleveland Rolling Mill Co. are to have
the option of taking a portion of the iron delivered at Chicago,
Ill., at the same price and on the same terms and conditions
as stated above for delivery in Cleveland, said Cleveland Roll-
ing Mill Co. to furnish good and suitable dock at which to
unload vessels, either at Cleveland or Chicago, and to pay
vessels any demurrage which they may be justly entitled to
by reason of delay in furnishing a dock at which they can be
discharged.

"The iron ore to be furnished at the Leland Iron Co., out
of which said iron is to be manufactured, is as follows :

"6000 tons Cleveland mine.

"5000 tons Norway mine.

"1500 tons Rolling Mill mine.

"1500 tons Stephenson mine.

"And whereas Rhodes & Bradley's contracts with said
mining companies are to the effect that in case of accidents or
strikes at said mines, resulting in reduced output of ore, said
companies are to have the privilege of reducing the amounts
due Rhodes & Bradley, as above stated, in same proportion
as other sales, the said Cleveland Rolling Mill Co. agree not
to hold Rhodes & Bradley responsible for delivery of pig
iron beyond the product of such ores as the mining companies
deliver them; also, in case of accidents or strikes at said
Leland furnace, resulting in the stoppage of said furnace,

then Rhodes & Bradley are not to be held responsible for delivery of pig iron under the contract, beyond the responsibility of the Leland Iron Co. to them under the contract between said Leland Iron Co. and Rhodes & Bradley, dated January 14, 1880, which contract, as well as Rhodes & Bradley's contracts with the mining companies, is hereby made a part of this agreement."

Prior to January 14, 1880, the plaintiffs had made agreements in writing with the owners of the four mines for the purchase of the amounts of ore above mentioned, to be delivered by them to the plaintiffs during the season of navigation in 1880. And on January 14, 1880, the plaintiffs made an agreement in writing with the Leland Iron Company, which was the owner and manager of a furnace at Leland in the State of Michigan, by which the plaintiffs agreed to sell to that company the same amounts of those ores respectively, "to be furnished, 1500 tons in May, 1880, navigation permitting, and 2500 tons each month thereafter as nearly as may be, and all to be delivered to vessel before November 1, 1880, and in suitable quantities of each for the mixtures desired by said Rhodes & Bradley;" and also agreed "to purchase the entire product of pig iron of the Leland furnace made from the ores so furnished, at the rate of $40 per ton, cash, delivered over the rail at Chicago, or $40.25, cash, at Cleveland, at the option of said Rhodes and Bradley, they to provide proper docking facilities for prompt unloading of vessels;" and the Leland Iron Company agreed "to manufacture pig iron from said ores as nearly as practicable of the grades which said Rhodes & Bradley shall desire, and to ship same in cargo lots as rapidly as possible after manufacture during season of navigation to said Rhodes & Bradley, to Chicago or Cleveland as aforesaid."

A jury was duly waived by stipulation in writing, and the case was tried by the court, which found specially that all the above contracts were executed and delivered by the parties thereto, and further specially found as follows:

"3. That the plaintiffs, between May 16 and October 18, 1880, delivered to the Leland Iron Company, at Leland, Mich-

igan, 14,168 tons of iron ore, of which 5980 tons were from the Cleveland mine, 4405 tons were from the Norway mine, 1478 tons were from the Rolling Mill mine, and 2305 tons were from the Stephenson mine.

" 4. That the ores from the Stephenson mine and the ores from the Norway mine were alike in value and quality, and that Stephenson mine ore was equally as good and identical in quality and value with the ore from the Norway mine.

" 5. That the Leland Iron Company proceeded, soon after such ores began to arrive at Leland, with proper diligence to manufacture said ores into pig iron, and ship the same in cargo lots as rapidly as possible after manufacture from Leland to Cleveland, Ohio, and there delivered the same to the defendant, and the defendant accepted and paid for the same; that before the close of navigation for the season of 1880 the Leland Iron Company had so manufactured and delivered to the defendant 3421 tons of said pig iron; that the defendant made no objection to the acceptance of said pig iron on said contract between the plaintiffs and the defendant, on the ground of the quality of said iron, or of undue delay in the execution of said contract.

" 6. That the navigation between Leland and Cleveland and Chicago closed in the fall of 1880 about November 15; that the last cargo of iron was shipped from Leland on November 8, and although the Leland Iron Company had enough iron manufactured to have furnished another cargo of 502 tons by November 15, no vessel could be obtained by which to ship it that fall; that after the close of navigation the Leland Iron Company continued the manufacture of said ore into pig iron without unreasonable delay, and that after November 8, 1880, and up to and including February 28, 1881, the Leland Iron Company had made 2100 tons of pig iron from said ore, and by May 7, 1881, had manufactured and on hand ready for shipment about 3506 tons; that on May 7, 1881, the Leland Iron Company resumed the shipment of said iron in cargo lots to the defendant at Cleveland, and continued such manufacture and shipment in cargo lots as rapidly as possible, so that the entire product of said ore was manufactured and shipped

from Leland by and including July 2, 1881 ; all which cargoes arrived at Cleveland in due course, and were there tendered to the defendant, and the defendant refused to accept said pig iron or any part thereof and refused to pay for the same; that if the average daily product of said furnace from November 8, 1880, to May 8, 1881, had been the same as the average daily product from May 18, to November 8, 1880, all said 14,000 tons of ore would have been made into pig iron by about May 10, 1881 ; but in fact the furnace was shut down for a time, and part of the time the blast was checked, for want of a sufficient supply of charcoal, so that about 1100 tons of said pig iron were made after May 8, 1881.

" 7. That in the latter part of the month of February, and again about March 3, 1881, the defendant notified the plaintiffs that it would not accept, under said contract of February 16, 1880, any iron which was made from said ore after December 31, 1880; and that some time during the month of May, 1881, the defendant notified the plaintiffs that it would not accept any more iron from the plaintiffs under said contract.

" 8. That the fair market price of said pig iron in the cities of Cleveland and Chicago during the months of March, April, May, June, and July, 1881, was $27 per ton; that the total amount of iron manufactured from said 14,000 tons of iron [ore] and shipped by the Leland Company to the defendant after the opening of navigation in the spring of 1881 was 4579 tons ; and that the difference between the market value of $27 per ton and the contract price was $18 per ton, making a total difference on 4579 tons of $82,422."

The court rendered judgment upon the special findings for the plaintiffs in the sum of $82,422, and costs.   17 Fed. Rep. 426.   The defendant excepted to the admission of evidence at the trial, to the refusal of the court to make certain special findings requested, and to the judgment for the plaintiffs; and afterwards sued out this writ of error.

*Mr. George F. Edmunds* and *Mr. William E. Cushing*, for plaintiff in error, cited : *Norrington* v. *Wright*, 115 U. S. 188 ; *Filley* v. *Pope*, 115 U. S. 213 ; *Knickerbocker Insurance Co.* v.

*Tolman*, 80 Ill. 106; *Taylor* v. *Beck*, 13 Ill., 376 ; *Brawley* v. *United States*, 96 U. S. 168; *Tamvaco* v. *Lucas*, 1 El. & El. 581 ; *Tamvaco* v. *Lucas*, 1 El. & El. 592; *Rommel* v. *Wingate*, 103 Mass. 327 ; *Stevenson* v. *Burgin*, 49 Penn. St. 36 ; *Johnson* v. *Raylton*, 7 Q. B. D. 438; *Hydraulic Engineering Co.* v. *Mc-Haffie*, 4 Q. B. D. 670; *Dingley* v. *Oler*, 117 U. S. 490; *Lovell* v. *St. Louis Ins. Co.*, 111 U. S. 264 ; *Hochster* v. *De La Tour*, 2 El. & Bl. 678; *Avery* v. *Bowden*, 5 El. & Bl. 714; *Reid* v. *Hoskins*, 5 El. & Bl. 729; *Frost* v. *Knight*, L. R. 7 Ex. 111; *Roper* v. *Johnson*, L. R. 8 C. P. 167 ; *Smoot's Case*, 15 Wall. 36.

*Mr. Enoch Totten*, (with whom was *Mr. J. M. Flower* on the brief,) for defendants in error, cited : *Reed* v. *Insurance Co.*, 95 U. S. 23 ; *Thorington* v. *Smith*, 8 Wall. 1; *United States* v. *Peck*, 102 U. S. 64; *Bradley* v. *Steam Packet Co.*, 13 Pet. 89; *Hopkins* v. *Hitchcock*, 32 L. J. (N. S.) C. P. 154; *King* v. *Parker*, 34 Law Times, 887; *Meincke* v. *Falk*, 61 Wis. 623 ; *Atwood* v. *Emery*, 1 C. B. (N. S.) 110; *Swaine* v. *Semans*, 9 Wall. 254; *Woods* v. *Miller*, 55 Iowa, 168; *Fort Scott* v. *Hickman*, 112 U. S. 150; *Exchange Bank* v. *Third National Bank*, 112 U. S. 276.

MR. JUSTICE GRAY, after stating the case as above reported, delivered the opinion of the court.

The original defendant duly pleaded, and has earnestly argued, that the plaintiffs did not perform their contract, in respect either to the nature of the thing furnished, or to its quantity, or to the time of delivery. The principal objections, each of which would require consideration if the decision of the case depended upon it, are as follows:

As to the nature of the thing: That the amounts of ore from each of the four mines named, delivered at the furnace and there manufactured into pig iron, differed from the amounts contracted for, the ores from three of the mines being respectively 20 tons, 595 tons and 22 tons less, and the ore from the fourth mine 805 tons more.

As to the quantity: That the plaintiffs tendered to the de-

fendant the product of 14,168 tons of ore, when the contract was for the product of 14,000 tons only.

As to the time of performance: That the pig iron was not made and shipped "as rapidly as possible;" and especially that so much of it as had not been made and shipped before the close of navigation in 1880 was not shipped "on the opening of navigation of 1881, or as near the opening as possible."

We have not found it necessary to consider the objections as to the kind of iron, or how far any such objections were waived by the defendant, or the effect of tendering too much, or yet the objections to the competency of evidence admitted at the trial, or the variance suggested between the declaration and the proof, because we are of opinion that the delay which took place in the making and shipment of so much of the pig iron as had not been made and shipped before the close of navigation in 1880 is fatal to the plaintiffs' right to maintain this action.

In a case decided upon much consideration at the last term, the general rule was stated as follows: "In the contracts of merchants, time is of the essence. The time of shipment is the usual and convenient means of fixing the probable time of arrival, with a view of providing funds to pay for the goods, or of fulfilling contracts with third persons. A statement descriptive of the subject matter, or of some material incident, such as the time or place of shipment, is ordinarily to be regarded as a warranty, in the sense in which that term is used in insurance and maritime law, that is to say, a condition precedent, upon the failure or non-performance of which the party aggrieved may repudiate the whole contract." *Norrington* v. *Wright*, 115 U. S. 188, 203. See also *Filley* v. *Pope*, 115 U. S. 213; *Pope* v. *Porter*, 102 N. Y. 366; *Rommel* v. *Wingate*, 103 Mass. 327.

When a merchant agrees to sell, and to ship to the rolling mill of the buyer, a certain number of tons of pig iron at a certain time, both the amount of iron and the time of shipment are essential terms of the agreement; the seller does not perform his agreement, by shipping part of that amount at the time appointed and the rest from time to time afterwards;

and the buyer is not bound to accept any part of the iron so shipped.

In the case at bar, the plaintiffs were merchants at Chicago, and the defendant was the owner of a rolling mill at Cleveland. By the agreement between them, made in February, 1880, the plaintiffs sell to the defendant "the entire product of 14,000 tons iron ore, to be manufactured into pig iron with charcoal" at a certain furnace, "and to be shipped in vessel cargoes as rapidly as possible" to the defendant at Cleveland, "during the season of navigation of 1880," and "such portion of the product of said ores, as is made after the close of navigation of 1880, is to be shipped by vessel to Cleveland on the opening of navigation of 1881, or as near the opening as possible." The plaintiffs thus agree that all of the pig iron contracted for, that is not made and shipped before the close of navigation in 1880, shall be shipped as early in 1881 as navigation shall be open and vessels can be obtained. This implies that the whole of the ore shall be made into pig iron and ready for shipment as soon as navigation opens in 1881. The implication is confirmed by the further stipulation that the defendant shall have the privilege, upon paying the additional expense of transportation by land, "of ordering the iron, which may be made too late for shipment by lake during the season of 1880, through by rail to Cleveland during the winter of 1880 and 1881." In short, all the pig iron, not shipped before the close of navigation in 1880, is to be made before the opening of navigation in 1881, and to be then shipped as soon as vessels can be obtained, unless the defendant elects to have it previously forwarded by land.

The facts, as found by the court, bearing upon the question of the plaintiffs' performance of their agreement in this particular, are as follows: The whole amount of pig iron made from the 14,000 tons of ore was 8000 tons. Of these, 3421 tons were shipped in 1880, and accepted and paid for by the defendant. At the opening of navigation, early in May, 1881, there were manufactured and on hand ready for shipment only 3506 tons. The remaining 1073 tons were made afterwards, and the last cargo was not shipped until nearly two months after navigation opened.

The general statements in the sixth finding, that the owner of the furnace, after the close of navigation in 1880, "continued the manufacture of said ore into pig iron without unreasonable delay," and on the opening of navigation in 1881 resumed the shipment of iron to the defendant, "and continued such manufacture and shipment in cargo lots as rapidly as possible," are limited and controlled by the more precise statements in the same finding, that if the average daily product of the furnace had been the same from the close of navigation in 1880 to the opening of navigation in 1881, as it had been during the season of 1880, "all said 14,000 tons of ore would have been made into pig iron by about May 10, 1881; but in fact the furnace was shut down for a time, and part of the time the blast was checked, for want of a sufficient supply of charcoal, so that about 1100 tons of said pig iron were made after May 8, 1881."

The failure to have on hand a sufficient amount of charcoal to keep the furnace at work is not shown to have been due to "accidents or strikes," which were contingencies contemplated by all parties, and provided for in the contract sued on. But it was a state of things of which the plaintiffs assumed the risk by undertaking that the whole of the ore should be made into pig iron ready to be shipped as soon as possible after the opening of navigation in 1881.

After the contract for 8000 tons of pig iron had been partly performed on both sides in 1880, by the plaintiffs' having delivered, and the defendant's having accepted and paid for, 3421 tons of iron, then the thing which, by the terms of so much of the contract as was yet unperformed, the plaintiffs agreed to deliver, and the defendant agreed to take and pay for, was 4579 tons of pig iron, made and ready for shipment upon the opening of navigation in 1881, and then shipped as rapidly as possible; and the rights and duties of the parties as to the performance of this part of the contract were the same as if it had been the whole contract between them.

The true construction of the contract being that that amount of iron shall be ready to be shipped and be actually shipped as soon as navigation permits, "that is part of the description

of the subject matter of what is sold;" and "the plaintiff, who sues upon that contract, has not launched his case until he has shown that he has tendered the thing which has been contracted for, and if he is unable to show that, he cannot claim any damages for the nonfulfilment of the contract." Lord Cairns, in *Bowes* v. *Shand,* 2 App. Cas. 455, 468; *Norrington* v. *Wright,* 115 U. S. 188, 209.

The necessary conclusion is that the defendant was justified in refusing to accept any of the iron shipped in 1881; and whether the notice, previously given by the defendant to the plaintiff, that it would not accept under the contract any iron made after December 31, 1880, might have been treated by the plaintiffs as a renunciation and a breach of the contract, need not be considered, because the plaintiffs did not act upon it as such. *Dingley* v. *Oler,* 117 U. S. 490, 503.

It conclusively appearing, upon the facts found by the court below, that the original plaintiffs cannot maintain their action, it is ordered, in accordance with the precedents of *Fort Scott* v. *Hickman,* 112 U. S. 150, and *Allen* v. *St. Louis Bank,* 120 U. S. 20, that the

> *Judgment be reversed, and the case remanded to the Circuit Court, with directions to enter judgment for the original defendant.*