# CHARLESTON

RUFFNER BROTHERS *v.* DUTCHESS INSURANCE CO.

Submitted March 8, 1906.    Decided April 17, 1906.

1.  INSURANCE—*Inventory.*
    An inventory of a stock of merchandise, within the meaning of the term "inventory" used in what is known as "The Iron Safe Clause" of a fire insurance policy, is a list of all the articles of merchandise in the stock, sufficiently itemized to show the kinds and numbers or quantities thereof, together with their values at the time of making the same, as nearly as they can be ascertained. (p. 434.)

2.  INSURANCE—*Inventory.*
    In the case of a store, opening with an entirely new stock of goods, at or about the date of the issuance of the policy, the invoices of the first lot of goods put into it, giving the quantities thereof by items, with the cost prices, if preserved and kept for production, upon the demand of the insurer, as and for an inventory, will constitute such a list, and the insured will have substantially complied with so much of the policy as requires the taking of an inventory. (p. 434.)

3.  INSURANCE—*Inventory.*
    In determining what constitutes such an inventory, regard must be had to the purpose for which it is required, and, in seeking this, all parts of the "Iron Safe Clause" should be read and considered together. (p. 435.)

4.  FIRE INSURANCE POLICY— *Waiver of Breach—Agent—Estopped.*
    Cancellation of a fire insurance policy, by an agent of the company, having no authority to waive conditions, except by endorse-

ment on the policy or addition thereto, does not imply a waiver of a breach, previously made, of a promissory warranty therein contained, or estop the company from relying upon such breach as matter of defense to an action on the policy, though it be shown that the agents had knowledge of such breach. (p. 436.)

5. Insurance Policy—*Waiver—Cancellation of Policy.*

Violation of a clause of an insurance policy, declaring that it shall become null and void, if the hazard be increased by any means within the control or knowledge of the insured, is not waived by a letter, written at about the date of the fire, which caused the destruction of the property, by an agent of the company, having no authority to waive conditions, except by endorsement on the policy or addition thereto, notifying the insured that the policy is cancelled, and specifying said violation as the reason for cancelling it. (p. 436.)

6. Judgment by Appellate Court—*Reversal for Insufficiency of Evidence.*

This Court on reversing a judgment for the plaintiff, and setting aside a verdict, for insufficiency of evidence, and refusal of the trial court to exclude the evidence from the jury and direct a verdict for the defendant, will not remand the case for a new trial, but will render judgment for the defendant, when it does not appear that injustice will be done thereby. [By four judges, Poffenbarger, Judge, dissenting.] (p. 439.)

Appeal from Circuit Court, Kanawha County.

Action by Ruffner Brothers against Dutchess Insurance Company. Judgment for defendant and plaintiffs appeal.

*Reversed. Judgment for Defendant.*

Chilton, MacCorkle & Chilton and Murray Briggs, for plaintiff in error.

Mollohan, McClintic & Mathews, for defendants in error.

Poffenbarger, Judge:

The Dutchess Insurance Company complains of a judgment for the sum of $649.12, rendered against it by the circuit court of Kanawha county, on the 27th day of March, 1905, in favor of Ruffner Brothers, assignees of A. Haws and his son, H. H. Haws, who were doing business as The Haws Company.

The policy of insurance, under which the loss, sustained by The Haws Company, occurred, had covered a frame store building; a stock of general merchandise kept therein, and

the store and office furniture and fixtures. The stock of goods so insured was entirely new at the time of the issuance. of the policy. After the policy had been in force a short time, an addition to the building in which the store was kept was made for the accommodation of a steam grist mill, and the mill installed therein and operated to an extent not clearly indicated, before the fire occurred. In the meantime, Haws had attempted to obtain insurance on the mill from the agents from whom he had secured the policy on the store. They had declined it, and he had vainly tried to obtain it from another agency. Some days before the fire occurred, a member of the firm of Lohmeyer and Goshorn, the agents, had informed him they would give him no insurance on the mill, but they would carry his store at a six per cent rate, which was an increase of four per cent over that of the policy he then had.

The defenses relied upon by the defendant were two in number: first, non-compliance with that part of the Iron Safe Clause which required an inventory to be made within thirty days from the issuance of the policy, unless one had been taken within twelve calendar months prior to the date of its issue; and, second, violation of that clause of the policy which declared it would become void if the hazard should be increased by any means within the control or knowledge of the insured, unless permitted or waived by an endorsement on the policy or attached thereto.

As constituting substantial compliance with the requirement of an inventory, the plaintiff relied upon his invoices or bills. He reasonably contended that, it being a new store, the first lot of goods having been placed in it but a few days before the issuance of the policy, these bills constituted a complete list, by items, with the values annexed, of all the goods that had been put into the store. At the date on which the first lot was taken into the store and put upon the shelves, the invoices therefor, made up as complete and accurate a list of the goods as if they had been re-listed into a book. All goods subsequently put in, for which bills were likewise received and kept, were additions to the stock. The purpose and object of an invoice is not very clearly defined in insurance law. Most of the courts, in dealing with it, simply refer to the legal definition of the term inventory. This falls

far short of indicating what it is intended for, the function it
performs between the parties.   It seems to me perfectly plain
that the requirement is intended to secure, in the interest of
the insurance company, and possibly both parties, a basis, or
starting point, upon which to found an estimate of the value
of the stock in case of a loss.   It, of itself, indicates nothing
except the quantum and value of the stock at the time of the
taking thereof.   It does not indicate what they amounted to
at any previous or subsequent date, nor the average stock.
Having an inventory at a given date, however, and the
invoices for goods subsequently put in, the determination of
the aggregate value of all the goods in the store at the date
of the inventory and those subsequently put in, is a mere
matter of addition.   All insurance policies on merchandise
require the production of the invoices as well as the inven-
tory.   Another requirement which goes with the inventory
and the bills, as an ally, in working out the estimate, is the
book in which the account of sales is kept.   After ascertain-
ing, from the inventory and the bills for the goods subse-
quently put in, the aggregate as above stated, the quantities
and values of the goods sold out of the store are deducted,
and thus a fair and reasonable indication, as to the quantities
and value of the goods at the date of the fire, is obtained.
The three clauses of the iron safe provision require the in-
ventory and keeping of the books and their protection by
means of the iron safe.   In determining what they mean,
what more reasonable view could be taken than that they
must be all construed together?   Some courts exclude the
invoices and deny to them the force and effect of an inven-
tory, upon the fanciful ground that they are no index to the
value of the goods.   What better evidence of the value of
the goods could there possibly be than the bills showing what
they had cost?   They show the value as agreed upon between
the owner of the store and a disinterested third party, while
an inventory would show the value according to an estimate
put upon them by an interested party, knowing that an in-
ventory was made for the purpose of forming the basis of a
claim against the insurance company.   I am utterly unable
to see any force in that contention.   Of course the invoices
would not constitute an inventory in the case of a store
which has been running for a considerable time.   They would

not afford any basis upon which to begin the estimate, but in the case of a new store starting simultaneously with the issuance of the policy, or practically so, the first bill constitutes as good a basis for the beginning of the estimate as an inventory could possibly afford. It has been suggested in one or two instances that, if the bills were pinned together and some endorsement made upon them, indicating an intention to treat them as an inventory, they might, on the theory of substantial compliance, be deemed to constitute an inventory. In other words, they constitute an inventory if they are indorsed "inventory," otherwise they do not. This, to my mind, puts more merit into the name of the thing than it is entitled to. It sacrifices substance to mere form and technicality. What is an inventory, is to be determined in view of the peculiar circumstances of the case. What would substantially comply with the requirement in one case would not in another in which the circumstances are wholly different. For these reasons, we are unwilling to follow *Insurance Co.* v. *Knight*, 36 S. E. 821, *Fire Association* v. *Masterson*, 25 Tex. Civ. App. 518, and the Mississippi case in which the proposition advanced by the attorneys for the plaintiff in error arose, and we hold that the evidence is sufficient to sustain the finding of the jury in favor of the plaintiff on the first issue.

The violation of the clause against increase of hazard is admitted, but it is insisted that there was a waiver on the part of the defendant. The claim of waiver is predicated upon the knowledge which the agent of the defendant company had, at the time of the issuance of the policy, of the intention of the insured to build the addition to the store house and install a grist mill in it, and of the actual consummation of this design before the fire occurred, and upon a letter written by them to the insured, dated the day of the fire, but received on the day after that occurrence. The store was destroyed about ten o'clock on the night of December 23rd, and the letter was postmarked 1:30 A. M., December 24th. It reads as follows:

"A. Haws Esq City:—Dear Sir—We again call your attention to policy No. 3379 Dutchess Insurance Company covering on your building, stock and fixtures, which has not yet been returned to us for cancellation. We desire now to

notify you that the policy is cancelled on account of the grist mill exposure and of no effect, if you will return it the return premium will be paid to you.    The policy referred to is in the name of 'The Haws Co.'    Yours very truly, (signed) Lohmeyer & Goshorn.''

The claim of waiver is stated in two ways.    One is that cancellation of the policy necessarily implies that the party cancelling it deemed it to be, at the date of cancellation, in full force and effect, otherwise there would be a contradiction in terms and an inconsistency in conduct.    To cancel means to make void, to annul, to destroy, and it is said that that which has no existence or is not valid or of any effect, cannot be annulled, made void or destroyed.    The view that a breach of a condition or warranty in an insurance policy does not make it absolutely void, but only voidable, would be a sufficient answer to this contention.    Many cases hold that such is the effect.    *Insurance Co.* v. *Ileiduk*, 46 N. W. 481.    To the same effect are the decisions in Illinois, Missouri, Michigan and Iowa.    If not absolutely void, but only voidable, there would be no inconsistency in the act of cancellation by which it would be utterly destroyed.    Moreover, no such implication is recognized by the courts.    Deeds, contracts and other instruments are frequently cancelled, by courts of equity, on the express ground that they are void, for some reason shown, by way of removing cloud from title, or preventing some use of the instrument which might be injurious to the plaintiff.    Formerly it was held that a court of equity would not cancel a deed or other instrument which was void on its face, but the weight of authority now seems to be that such instruments will be cancelled.    Appeals are entertained by this and other courts from void judgments and decrees, notwithstanding the apparent implication raised by entertaining them that there is a judgment or decree.    In order to put the question beyond doubt and dispose of it upon non-technical grounds, it may be said there is no contradiction or inconsistency in the act of cancellation, and that it does not raise any implication of the continued life of the policy.    It is an absolute right conferred upon the insurer by the terms of the policy independently of any cause.    It might be exercised at any time, with or without cause.    Therefore, a cancellation does not imply even

that there was any cause of forfeiture, much less the additional fact that such cause was waived. The two things are in no sense connected or interdependent. A cause of forfeiture may be asserted, although no cancellation was ever made or attempted. If there had been no cancellation in this case, the defense could have been set up as fully and unreservedly as it has been. Even if it be admitted that the increase of hazard rendered the policy absolutely void, neither that fact, nor the right to rely upon it as a defense, had any connection whatever with the right of cancellation; and, if we say it rendered it void, the insurer might consistently exercise the right of cancellation in order to preclude the setting up of any claim under the policy, although void. In testing this question, it is proper to look beyond the facts of the particular case and see how the theory advanced would operate under other conditions. Take a case in which the insurer knows nothing of the cause of forfeiture at the time of the cancellation. Could it reasonably be said to have waived that of which it had had no knowledge? The argument advanced here would produce a waiver in that case.

The other theory of waiver is that the letter, although not physically attached to the policy, may be deemed in law to be added thereto, and to constitute a waiver in writing by the agents. That they had authority to execute such a waiver, or to grant permission, to do that which would increase the hazard, provided they did it by an endorsement upon the policy or a writing annexed to it, is not denied or questioned. Whether, if a waiver, it might be regarded as annexed to the policy, it is not necessary to say; for this paper does not, in express terms, waive the breach of the condition, nor, viewed in the light of the facts and circumstances, can it be construed to be a waiver. Its terms import the exact contrary of a waiver. The reference in it to the mill, as the reason for cancellation, plainly negatives intent to assume the additional risk. The letter expresses dissatisfaction with the conduct of the insured. On account thereof, he is notified that the policy is cancelled. There is not a word in the letter which expresses waiver or any intention to waive. There is no reference to liability or a claim of liability on the policy. As to whether the company is liable, or whether it will forego any right to defend on the ground of violation

of warranty or condition, the letter is absolutely silent. No reference whatever is made to the respective rights of the parties under it. Moreover, it bears on its face an implication that there had been a previous demand for the return of the policy. It begins by saying, "We again call your attention to policy No. 3379," &c. In point of fact, there may not have been any such demand, but whether true or false, it reflects intent on the part of the writers, and tends to negative any intention to waive the violation of conditions. In point of fact, the insured had been plainly informed that the company would not carry his building and store, at the price for which it had issued the policy, and that, in order to obtain a continuation of the protection afforded him by the policy, he would have to pay a premium three times as large. Having given him this notice, the agents might very reasonably have expected him to return the policy and make a new contract. For these reasons, our conclusion is that the letter does not constitutute a waiver, and that as the jury predicated its verdict upon the theory of a waiver, as shown by answers to special interrogatories, the court should have set aside the verdict.

The trial court further erred in refusing to exclude the evidence and to instruct the jury to render a verdict for the defendant, for the evidence establishes fully and clearly a violation of the warranty against increase of hazard. The plaintiff admitted the construction of the addition to the store room, the installation therein of a grist mill, the operation thereof and a material increase of hazard. These motions having been overruled, the case went to the jury under instructions, given at the request of both parties. Of the twelve asked for by the defendant, four were given and eight refused, and it excepted. It excepted further to the action of the court in giving one of plaintiff's instructions. In view of the judgment to be rendered here, refusing a new trial, it is unnecessary to examine the instructions.

The reasons which, in the opinion of the majority of the court, justify the rendition of judgment for the defendant here, and impel them to refuse to remand the case, with liberty for a new trial, are set forth in the opinion of JUDGE BRANNON in *Maupin* v. *Insurance Co.*, 53 W. Va. 557, and by JUDGE SANDERS in *Anderson* v. *Tug River Coal Co.*, de-

cided at this term. As I wholly dissented in the *Maupin case*, I expressed no opinion, concerning the propriety of rendering judgment for the defendant. Now, however, having carefully examined the authorities, analyzed them as best I can, and reached the conclusion that this action, on the part of the appellate court, is a violation of well settled legal principles, as well as a radical departure from the previous practice of this Court, I feel called upon to dissent from it and register my protest against it.

In those states in which this practice prevails, no distinction is made between cases in which the sufficiency of evidence to sustain the verdict is tested by a motion to exclude, made at the close of the plaintiff's evidence, a motion to direct a verdict at the conclusion of the whole evidence, and a motion to set aside the verdict after the rendition thereof. They apply it generally, simply saying that as they can clearly see that no better case can be made, or that it does not affirmatively appear that it can be done, they, therefore, refuse to remand. Such is the rule in Illinois, Georgia, Maryland, Michigan, Iowa, Washington and Misssuri. *Sanger* v. *Howard*, 147 Ill. 304; *Siddall* v. *Jansen*, 143 Ill. 543; *Neer* v. *Railroad Co.*, 138 Ill. 29; *Brink* v. *Morton*, 2 Ia. 411; *Herring* v. *Hawk*, 1 Mich. 501; *Mud* v. *Harper*, 1 Md. 110; *Gault* v. *Owing*, 6 Gill 191; *Stockton* v. *Frey*, 4 Gill 406; *Dayton* v. *Hooker*, 45 Mich. 153; *Rutledge* v. *Railway Co.*, 123 Mo. 141; *Carroll* v. *Transit Co.*, 107 Mo. 653; *Bernhard* v. *Reeves*, 6 Wash. 424.

In all the above named states, except Washington, the practice seems to be settled. In that state, however, a later decision, *Edmunds* v. *Black*, 13 Wash. 490, enunciates a contrary doctrine, holding that there must be a remand to the lower court when the evidence is insufficient to sustain a verdict. In that case, there was no evidence whatever to sustain it. In the case in 6 Wash. above cited, the matter seems not to have been discussed, but in the latter case it was, and, upon a careful review of the authorities, the court deliberately decided the question. In Arkansas the statute gives to the appellate court the broad power of rendering such judgments as justice may require. Even under that, the court took the view that it was unjust, and, therefore, violative of law, to refuse to remand a case upon reversing a

judgment for insufficiency of evidence, since, for aught the court knows, a better case can be made on a new trial. *Pennington* v. *Underwood*, 56 Ark. 53. In some other states, it has been held that, although the court has the power to refuse a new trial, it will only do so when it clearly appears that the plaintiff cannot better his case. This is the law in Wisconsin, but that court remands, when the verdict is unsupported by any evidence whatever, because it will not assume that the plaintiff cannot furnish the evidence to sustain his declaration. *Wright* v. *Rindskoph*, 43 Wis. 344. Such is the rule in Texas also. *Willoughly* v. *Townsend*, 93 Tex. 80; *Boettcher* v. *Prude*, 32 Tex. 472.

The best exposition of the rule in Pennsylvania is found in *Railroad Co.* v. *Norton*, 24 Pa. St. 465, in which the court said: "The plaintiff's declaration contained a good cause of action, and in such cases where we reverse, we always award a *venire de novo*, both because he may, on a second trial, find evidence to support his *narr.*, and because it is necessary to enable the defendant to recover his costs if the plaintiff fail to make out his case in evidence." Some other Pennsylvania cases are cited by the text-writers as being in conflict with this, but they will be found upon examination not to be. One of these is *Miller* v. *Ralston*, 1 S. & R. (Pa.) 309. The action was brought before the debt was due and the court refused a new trial because it appeaaed that there was no cause of action, nor even a pretense of one. Another is *Griffith* v. *Eshelman*, 4 Watts (Pa.) 51. There, it appeared from the plaintiff's declaration that he had no cause of action. His declaration was incurably bad. It was not a case of insufficiency of evidence nor one in which the evidence could be considered at all.

One case is cited from New Jersey, *Hinchman* v. *Clark*, 1 N. J. L. 340, but it stood upon a special verdict, the facts all ascertained. One is cited from Kentucky, *Broaddus* v. *Broaddus*, 10 Bush. 299; in which the court say they will remand except where there is no evidence to sustain the verdict. By what process of reasoning this conclusion was reached is not in any way indicated. Nothing is said about it in the opinion.

In South Carolina the sufficiency of the evidence is tested on the defendant's motion to nonsuit the plaintiff. In

*Townes* v. *Augusta*, 46 S. C. 15, the supreme court of that state, upon mature consideration, announced the rule as follows: "If the nonsuit was improperly refused, and the nature of the plaintiff's demand was such that no recovery could be lawfully had, this court will grant the motion, and dismiss the plaintiff's complaint. If, however, it was merely a case of insufficiency of proofs adduced at the trial to support the cause of action in itself of a proper and legal nature, this court will not dismiss the complaint upon appeal, but order a new trial, to afford the plaintiff an opportunity to make better proofs." I understand the distinction here stated to be the same as the one made by the Pennsylvania and New York courts, namely, if the declaration sets forth matter which does not, and cannot, constitute a good cause of action, final judgment of dismissal will be rendered by the appellate court, but if the declaration be good or curable by amendment, the case will be remanded.

The procedure in New York is under a statute which authorizes the appellate court to reverse or affirm, wholly or in part, or to modify, the judgment appealed from, and to grant a new trial if necessary or proper and to grant to either party the judgment which the facts warrant. Under an authority so broad and discretionary as that, the New York court of last resort has solemnly declared over and over that the appellate court cannot properly render final jurdgment for the appellant, unless the facts are conceded or undisputed, or are established by official record or found by the trial court, or it appears that no possible state of proof applicable to the issues will entitle the respondent to judgment. *Benedict* v. *Arnoughs*, 154 N. Y. 715; *Edmoston* v. *McLoud*, 16 N. Y. 543; *Hendrickson* v. *City of New York*, 160 N. Y. 144; *New* v. *Village*, 158 N. Y. 41.

Certain decisions of the Supreme Court of the United States are sometimes cited for the proposition that, on reversing a judgment for insufficiency of evidence, on a motion to set aside, or refusal of a direction to the jury to find for the defendant, it will enter final judgment. This is a misapprehension. Those cases do not assert such a proposition. In all of them the parties waived trial by jury and submitted the matters in difference to the court. That is equivalent to a demurrer to the evidence. By agreement of the parties,

the case is withdrawn from the jury. Both parties voluntarily relinquish the right to a jury trial, *Allen* v. *St. Louis Bank*, 120 U. S. 20; *Rolling Mill* v. *Rhodes*, 121 U. S. 255; *Fort Scott* v. *Hickman*, 112 U. S. 150, cited in the *Maupin case*. In all these cases, it is expressly stated that the trial by jury was waived and the case submitted to the court by a formal written stipulation, When the trial is by a jury and the verdict set aside for want of sufficient evidence, the practice in the Supreme Court of the United States is shown by the decision in *Railroad Co.* v. *Jones*, 95 U. S. 439. The court held that the evidence disclosed a clear and undisputable case of contributory negligence on the part of the plaintiff. The defendant had failed to ask the court to direct a verdict, but had asked an instruction directing the jury to find for the defendant, if they should find that the plaintiff knew the box-car was the proper place for him and that his position on the pilot of the engine was a dangerous one. The court concluded its opinion as follows: "The plaintiff was not entitled to recover. It follows that the court erred in refusing the instruction asked upon this subject. If the company had prayed the court to direct the jury to return a verdict for the defendant it would have been the duty of the court to give such instruction, and error to refuse." Instead of rendering judgment for the defendant, however, the case was remanded with directions to issue a *venire de novo*. How much stronger case could be presented than that? There was an affirmative showing by the plaintiff's own evidence of a fact that effectually barred recovery.

In *Pleasants* v. *Fant*, 22 Wall. 116, the court gives a full exposition of the principles upon which the motion to exclude evidence rests. In the concluding part of the opinion, Mr. Justice Miller said: "It is the province of the court, either before or after the verdict, to decide whether the plaintiff has given evidence sufficient to support or justify a verdict in his favor. Not whether on all the evidence the preponderating weight is in his favor, that is the business of the jury, but conceding to all the evidence offered the greatest probative force which according to the law of evidence it is fairly entitled to, is it sufficient to justify a verdict? . If it does not, then it is the duty of the court after a verdict to set it aside and grant a new trial." He then shows the absurdity of requiring the

submission of the evidence to the jury under such circumstances and says: "In such case the party can submit to a nonsuit and try his case again if he can strengthen it, except where the local law forbids a nonsuit at that stage of the trial, or if he has done his best he must abide the judgment of the court, subject to a right of review, whether he has made such a case as ought to be submitted to the jury; such a case as a jury might justifiably find for him a verdict." It is to be observed here that that court says that when a motion to direct a verdict is made, the plaintiff has a right to take a nonsuit. He is not bound to let his case be withdrawn from the jury in that way. He may get out of court, for the time being, for the purpose of bettering his case on another trial.

This Court, in *Knight* v. *Cooper*, 36 W. Va. 232, announced the two principles declared by the Supreme Court of the United States. There was a case of insufficiency of the evidence, one in which the court might have directed a verdict, had it been requested, and this Court reversed the judgment, set aside the verdict and remanded the case, suggesting that the trial court, on the same evidence, in another trial, might direct a verdict "first giving the plaintiff an opportunity to suffer a nonsuit if he desired." When an appellate court, on reversing a judgment and setting aside a verdict for insufficiency of the evidence, whether there has been a motion to exclude at the conclusion of plaintiff's evidence, a motion to direct a verdict upon all the evidence, or a motion to set aside the verdict, renders judgment for the defendant, it denies to the plaintiff the opportunity to take a nonsuit. In the case of motions to exclude and direct, he is not given an opportunity to better his case in view of the final action by the court; for the reason that he is under no duty to ask for a nonsuit in the trial court, because the court refuses and overrules the motion. His situation is the same as a plaintiff when his declaration or bill is demurred to. As long as the court rules with him, holding his pleadings sufficient, there is a presumption of correctness, upon which he may rely, and he is under no duty to ask leave to amend. It is only when the court says the pleading is insufficient that the party is put under a duty to ask leave to amend. So where the sufficiency of his evidence is challenged, by a mo-

tion to exclude or direct a verdict, as long as the court rules in his favor, he may well suppose that his evidence is sufficient, and is excused from making application to the court for leave to strengthen it.   For the court afterwards to turn around and render a judgment against him, without giving the opportunity to better his condition, which he could have had in the court below, and of which that court could not have deprived him, is to take him by surprise, and do him a rank injustice.   Besides, for aught the court can know, except by way of guess, it may grievously injure him.   The supreme court of Vermont, in reversing a judgment in which such a motion was made and ought to have been sustained, said:   "While we hold that it was the duty of the court to have entertained the defendant's motion to direct a verdict and enter judgment in its favor; and while generally it is the duty of this court to enter such judgment as the trial court should have done, yet, if the trial court had sustained the defendant's motion, the plaintiff might have desired, and been permitted to introduce further evidence, and she may desire to do so on another trial, hence, the cause *is remanded for a new trial.*"   *Latremouille* v. *Railway Co.*, 63 Vt. 336. To see how the plaintiff, in such case, may protect himself by exercising his right to take a nonsuit, it is only necessary to bear in mind that the court, in acting upon such a motion, performs two functions.   It first determined whether there is sufficient evidence to take the case to the jury.   This is a preliminary step.   If the court be of opinion that it is not sufficient, then follows the order of exclusion or direction of the verdict.   Upon the announcement by the court that, in its opinion, the evidence is insufficient, the plaintiff has an opportunity, before the verdict is rendered under the direction of the court, to take a nonsuit and thereby prevent his case from being taken from the jury by the court in its then condition.   He thereby saves to himself his constitutional right of a trial by jury.   This principle puts it beyond the power of the defendant and the court to take his case from the jury in that way.   Whether that right is a valuable one to him in a particular case, it is not for the court to say, until the defendant has put himself in a position to authorize such action.   Though a court may clearly see that no harm, in a practical sense, will result from forcing a defendant to

trial on a bad declaration it can never overrule a demurrer for that reason. He cannot be deprived, for reasons of mere expediency, of his right to require a good declaration or bill before pleading or answering. The law deems that right to be a valuable and sacred one, whether it be so, in the particular case or not, and does not permit any court to assert the contrary. Nor can a court properly deprive a litigant of any other legal right, because, forsooth, the judge cannot see how he is injured thereby. By rendering final judgment in such cases as this, the plaintiff is deprived of his opportunity to better his case. It directly and expressly refuses that which the trial court would have been bound to allow him, had it concluded the evidence was insufficient. The rendition of a judgement by the appellate court, in such a state of the case, works another injury in a legal sense, by putting the parties on an unequal footing. It enables the defendant to have three chances, one before the court and two before the jury, while the plaintiff has but one, a chance before the court. It allows the defendant to make a demurrer to the evidence against the plaintiff, for his own benefit, without subjecting himself to the operation of a demurrer. Upon the court's refusing his motion, he has a chance of a verdict in his favor. If he fails to get that, he comes up to the appellate court, on the issue of law, and has final judgment. If the verdict be for the defendant, however, and the plaintiff is compelled to come to this Court to get rid of it, upon reversing the judgment and setting aside the verdict, he cannot have a final judgment against the defendant, but must go back and give the defendant another chance before the jury. Upon what principle an appellate court can justify such a discrimination between parties, I am unable to see. It is to be remembered in this connection, too, that the subject matter of this discrimination is the constitutional right of a jury trial. It is more than a mere matter of form or technicality, even if it could be set aside and ignored as a matter of form. While the courts and text-writers say a motion to exclude, or direct a verdict, is equivalent to a demurrer to evidence, they do not mean that it is in all respects equivalent thereto, but only that in determining whether it shall be sustained or overruled, the principles governing a demurrer shall apply. Where the parties join in a demurrer, the case is taken from

the jury absolutely as to both parties.   Neither has any right
to go back to the jury, unless there has been error in admit-
ting or excluding evidence.   The whole matter is submitted
to the court for final determination.   What was said above
about the inability of the defendant and the court to take
from the plaintiff his right to a trial by jury, was qualified
by the phrase "in that way," namely, by a motion to exclude
or direct a verdict.   I am not to be understood as intimating
that the plaintiff cannot be compelled to join in a demurrer.
When he is compelled to do so, however, the other party is
also compelled to withdraw his case from the jury, so that
both parties stand on an equal footing, forever separated
from the jury, and their case wholly in the hands of the
court.

Very few of those courts, in which the practice of render-
ing judgment on a reversal obtains, if indeed any, have given
this subject careful and mature consideration.   They have
dismissed it with a few words, usually with the remark that
it is not perceived how the plaintiff can make a better case,
or that it does not appear that he can do so, wherefore the
granting of a new trial will be useless.   I have observed that
in one or two instances it has been said that it ought to be
done in order to put an end to the litigation; but this reason
falls under the condemnation of the great weight of author-
ity.   Even the courts that have given it, have said in the
same breath they would grant a new trial, if they could see
that the plaintiff could make a good case, while others have
said they would grant it in all instances in which it does not
affirmatively appear that the plaintiff could not by any pos-
sibility make a good case.   All the reasons assigned, by all
the courts that indulge in that practice, may be included in
that idea of utility or expediency, which utterly ignores legal
principles, and, if extended, would lead to the abolition of
all forms of action.   It would only be necessary to have a
judge and a jury, and all pleadings might be dispensed with.
The trial of an equity suit on a declaration in debt would be
perfectly justifiable.   The suggestion that, as the plaintiff
has had one trial, he has no legal right to another, is one ad-
vanced for the first time, so far as I am able to see, in *Mau-
pin* v. *Insurance Co.*   I think he has, unless the defendant
has taken the proper step to deprive him of it by a demurrer

to the evidence.   Even in that case, it is likely the plaintiff may avoid the effort to bind him, by taking a nonsuit.   While he must join in the demurrer or dismiss his action, I do not see that the court can compel him to further prosecute, or elect for him which alternative shall be taken.   The statute forbids the taking of a nonsuit after the jury has retired from the bar, but limits the right no further, and I know of no authority in the court to add to it.   The right may be of no practical value to him, but it is a legal right of which a court cannot deprive him, except by trampling the law under foot.

*Maupin* v. *Insurance Co.* is the first decision by this Court in which the rule here enforced was ever applied.   No precedent for it will be found in any of the Virginia decisions, prior to the division of the state.   Even a fatal variance between the declaration and the proof was not ground for any such action, though it is in some other states.   In *Calvert* v. *Bowdoin*, 4 Call. 217, the court laid down this proposition: "If the evidence differs from the statement in the declaration, a judgment of nonsuit will be given by the court of error; and the cause will not be sent back to the court below with a direction to call the plaintiff, or to instruct the jury that the evidence does not support the declaration."   Instead of rendering a judgment for the defendant against the plaintiff, and making the matter *res judicata*, the court merely dismissed the action.   This is in accord with the rule declared by the South Carolina court and by the Pennsylvania court as above shown.

For these reasons, I am opposed to the departure made in the *Maupin* case and in the case of *Harvey* v. *Coal Co.*, and would remand this case instead of rendering judgment for the defendant.   If the defendant desired the case to be taken from the jury, it should have demurred to the evidence and deprived itself of any right to go to the jury, while taking that right from the plaintiff.

BRANNON, JUDGE:

I concur in the judgment, but I doubt point 2 of the syllabus.