## CONNECTICUT FIRE INS. CO. v. LAKE TRANSFER CORPORATION et al.

### No. 12303.

### District Court, E. D. New York.

### July 12, 1932.

Purdy & Purdy, of New York City (Edmund F. Lamb, of New York City, of counsel), for libelant.

Robert M. McCormick, of New York City, and Burke & Desmond, of Buffalo, N. Y. (Charles S. Desmond, of Buffalo, N. Y., of counsel), for respondent Lake Transfer Corporation.

Duncan & Mount, of New York City, and Slee, O'Brian, Hellings & Ulsh, of Buffalo, N. Y. (Dana B. Hellings, of Buffalo, N. Y., of counsel), for respondent Hanna Furnace Corporation.

GALSTON, District Judge.

This libel was brought by the Connecticut Fire Insurance Company, as assignee of a right of action of the Seaboard Great Lakes Corporation, resulting from a loss which the latter corporation sustained by virtue of the refusal of the Niagara Sprayer & Chemical Company, the consignee of a certain shipment of sulphur, to accept a certain bargeload forming part of said shipment.

The Freeport Sulphur Company contracted with the Seaboard Great Lakes Corporation for the transportation of the shipment of sulphur in question. The sulphur was then loaded at New York on seven barges of the Seaboard Great Lakes Corporation, for delivery to the Niagara Sprayer & Chemical Company at Middleport, N. Y. Four of these barges carried their loads directly to Middleport. No difficulties were encountered dur-

ing the process of unloading, and the cargo was delivered sound.

Three of the barges, the E. A. Leach, Nonesuch, and G. L. No. 30, were of a type which when light would have been unable to clear the bridges on the New York State Barge Canal. In consequence, these barges carried their cargoes first to Buffalo. At that point it was necessary to transfer the cargoes to other barges.

Accordingly, the Seaboard Great Lakes Corporation employed the Lake Transfer Corporation to effect the shift of cargo. The latter company in turn engaged the Hanna Furnace Corporation, the impleaded respondent, to make the transfers of the cargo from the three barges referred to, to other barges. The work of unloading and loading was undertaken by the Hanna Furnace Company at its ore dock at Buffalo.

The cargo from the E. A. Leach was transferred on September 5, 1930, to the Pelham, which had come to Buffalo after unloading at Middleport. The Pelham was then taken to Middleport and unloaded on the 6th and 7th of September, 1930. The cargo on the Nonesuch was transferred on September 6, 1930, to the barge Spillway, which was also taken to Middleport, and arrived there on September 8, 1930.

As the sulphur, which was unloaded from the Pelham and the Spillway carrying the cargoes formerly of the E. A. Leach and the Nonesuch, was put through the unloading equipment and conveyor system of the Niagara Sprayer & Chemical Company, fires broke out, particularly in that part of the equipment known as the "crusher." Investigation disclosed the presence of pieces of iron or iron ore in the sulphur. On September 10th a fire of considerable dimensions developed which carried to the warehouse and destroyed a considerable part of the warehouse conveyor system and a large portion of sulphur which had been stored in the warehouse.

After this, as appears from the depositions taken at Buffalo, the consignee notified the shipper on September 11, 1930, that, because of the contamination of the two prior cargoes, it was compelled to reject the cargo of the barge G. L. No. 30. At that time the cargo on the G. L. No. 30 was in process of transfer to the barge Pelham at the Hanna dock.

The first question to be considered is whether the consignee as a matter of law had the right to refuse the delivery of the balance of the cargo being transferred at the Hanna dock.

The contract of sale from the Freeport Sulphur Company, though not offered in evidence so far as I can ascertain, provided for the purchase of sulphur by the Niagara Sprayer & Chemical Company on a consignment basis, whereby the seller was to deliver to the consignee the sulphur to be stored in the consignee's warehouses at Middleport, and the consignee was to pay monthly for such amounts thereof as it used.

McDonald, the purchasing agent and credit manager of the Niagara Sprayer & Chemical Company, said: "The ordinary custom is for the Freeport Sulphur Company to call us on the telephone in advance of the arrival of the ship in New York, and learn how much tonnage we could take care of conveniently at that time; and they asked permission at this time to ship us approximately 3,500 long tons, and we gave it to them."

Further: "The contract provided that all sulphur delivered at Middleport must eventually be purchased by the Niagara Sprayer & Chemical Company, in this way: that we report, on the fifth day of the following month, all consumption of the preceding month; and we are billed for that consumption. These contracts are annual in their term. In case a new contract was not entered into with the Freeport Sulphur Company, the stocks then on hand, on a consignment basis, would be immediately billed to the Niagara Sprayer & Chemical Company. If a new contract was entered into, we then reported again."

I find as a fact that the two cargoes delivered at Middleport on the Barges Pelham and Spillman on or about September 8, 1930, were in fact contaminated owing to the negligence of the respondent Hanna Furnace Corporation. The presence of the contaminating iron ore can be explained in no other way.

The sulphur originally had been laden in the Freeport Sulphur No. 5 at seaboard in Texas. The cars which were used in transportation had been those exclusively used for sulphur cargoes. Prior to the loading of the sulphur into the barges at New York, the barges had all been thoroughly inspected. Further testimony shows that the hatches on the barges Nonesuch and G. L. No. 30 were covered at New York as soon as the barges were loaded. So that there is no reason to believe that, when the cargo left on the barges from the port of New York for Middleport,

it was in any degree contaminated or that it became contaminated in transportation to Buffalo.

On the other hand, the presence of the iron ore is readily accounted for, when it is borne in mind that the Hanna Furnace Corporation is a manufacturer of pig iron, and stores at its plant and dock quantities of iron ore. It is entirely likely that the clam scoop which was used on that dock in transferring the sulphur to the Pelham and the Spillman had particles of ore which were deposited with the sulphur in the act of unloading and loading. Piles of iron ore were lying on the Hanna dock at the time of the loading operations. It is significant that the cargoes in the four barges which went directly from New York to Middleport were found to be in sound condition on delivery.

In the circumstances, it would have been hazardous on the part of the consignee to accept delivery of any more of the cargo which had been transferred at the Hanna dock; and, as a matter of law, the consignee was within its rights in rejecting further deliveries of the total consignment.

Almost a similar situation was the subject of controversy in McDonald v. Kansas City Bolt & Nut Co. (C. C. A.) 149 F. 360, 363, 8 L. R. A. (N. S.) 1110, and Judge Sanborn there said: "Counsel insist, however, that the purchaser had the right to refuse to take the articles in the last four car loads regardless of their presumptive character, because the goods furnished by the plaintiff in its first deliveries were not in accordance with the terms of the contract, and in support of this proposition they cite Norrington v. Wright, 115 U. S. 188, 205, 6 S. Ct. 12, 29 L. Ed. 366; King Philip Mills v. Slater, 12 R. I. 82, 34 Am. Rep. 603; Cleveland Rolling Mill Co. v. Rhodes, 121 U. S. 255, 7 S. Ct. 882, 30 L. Ed. 920; Pope v. Allis, 115 U. S. 363, 371, 372, 6 S. Ct. 69, 29 L. Ed. 393; Husted v. Craig, 36 N. Y. 221; Campbell Printing Press & Mfg. Co. v. Marsh, 20 Colo. 22, 36 P. 799; Filley v. Pope, 115 U. S. 213, 219, 220, 6 S. Ct. 19, 29 L. Ed. 372; National Surety Co. v. Long, 125 F. 887, 60 C. C. A. 623, and other cases of like character. The decisions in these cases hold that, where the vendor is required by an entire contract, as in the case at bar, to make successive deliveries of the articles sold, and the first deliveries fail to comply with the terms of the agreement either in the quality or quantity of the goods or in the times or places of delivery, the vendee by prompt notice of his refusal to further perform upon the discovery of the failure may relieve himself from liability for subsequent deliveries. This, however, is not his only remedy. He has the option, upon the discovery of the seller's default, to refuse to receive and pay for further deliveries, and thus to terminate the contract, or to permit its performance to proceed, and to rely upon his damages for the vendor's breach."

This passage is quoted with approval in Roxford Knitting Co. v. Hamilton Mfg. Co. (C. C. A.) 205 F. 842.

What damages resulted from the justified rejection will have to await the report of the commissioner to be appointed. The proof shows that the libelant stands in the shoes of the Seaboard Great Lakes Corporation, which in turn was under obligation to the seller to deliver the cargo sound. The negligence involved in the transportation seems to have been wholly that of the Hanna Furnace Corporation, respondent impleaded, though the Lake Transfer Corporation, entirely familiar with the nature of the business of the Hanna Furnace Corporation and the condition of its plant, cannot escape responsibility.

The libel is sustained as against both parties, and the libelant may have a decree.

If this opinion is not in sufficient compliance with the rule requiring findings of fact and conclusions of law, submit findings of fact and conclusions of law in accordance therewith.